———————————————

No. 95-1190

———————————————

JULIAN TONEY,                         *
                                      *
     Plaintiff - Appellant    *
                                      *
     v.                               *    Appeal from the United States
                                      *    District Court of Minnesota
                                      *
WCCO TELEVISION, MIDWEST CABLE  *
AND SATELLITE, INC. also known  *
as WCCO TV, Channel 4, also     *
known as IOWCCO TV,             *
Channel 411                     *
                                      *
     Defendant - Appellee.     *


———————————————

Submitted: October 19, 1995

Filed: June 7, 1996

———————————————


Before ARNOLD, Chief Judge, WHITE,[*] Associate Justice (Ret.), and LOKEN, Circuit Judge.


WHITE, Associate Justice (Ret.).


## I.   INTRODUCTION

     Plaintiff-Appellant Julian Toney ("Toney") brought this action against Defendant-Appellee WCCO Television, Midwest Cable and Satellite, Inc., a/k/a WCCO TV, Channel 4 ("WCCO"), alleging that a report on the sale of dogs to research institutions defamed him

———————————————

     [*]    The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

and defamed him by implication. The district court granted summary judgment to WCCO. For the reasons set forth below, we reverse in part and affirm in part the district court's judgment that WCCO did not defame Toney, reverse its dismissal of Toney's defamation by implication claim, and remand this case for further proceedings.

## II. BACKGROUND

Toney is a dog dealer who resides in Iowa and does business in Iowa, Missouri and Minnesota. Toney, who had registered with and was licensed by the United States Department of Agriculture ("USDA"), sold dogs to the University of Minnesota. On or about May 20, 1992, WCCO, a television station headquartered in Minneapolis, Minnesota, broadcast a report about how certain dog dealers sold stolen dogs to research institutions for use in medical research. The broadcast included interviews with a representative from the University of Minnesota laboratories, an official from the USDA, owners of dogs who believed that their pets may have been stolen and sold to research laboratories as well as Toney and another USDA licensed dog dealer.

In pertinent part, WCCO's report stated that:

> So these animals that are "retired from service, " or unclaimed at the pound, or stolen from unsuspecting owners are sold to middlemen. The USDA licenses these middlemen and calls them Class B dog dealers. According to the Animal Welfare Act only these Class B [dog] dealers can sell animals to research institutions. But we found plenty of holes in this system that may also be protecting animal thieves.

> \* \* \* \*

> South about 40 miles on the Iowa/Missouri border, we found the place where Class B dealer Julian Toney buys the dogs he sells to the University.

> \* \* \* \*

> According to USDA records Mr. Toney supplies about a thousand dogs a year to the University of Minnesota. He told us the university is only about a fifth of his business. He said he seldom gets animals from dog pounds.

2

But when we checked his 1990 records, we found he was telling the USDA just the opposite.

Last week, the USDA confirmed that Julian Toney himself is under investigation for falsification of records.

* * * *

No one is accusing major research institutions of seeking out stolen pets for their experiments.  But the system relies on human honesty and adequate enforcement, and we found shortages of both.

App. at 46-48.  Shortly after the broadcast, the USDA charged Toney with falsifying his records.[1]

After WCCO refused to retract its statements about Toney, he filed a two-count complaint alleging that WCCO defamed him directly and also by implication.  Specifically, Toney maintained that the report implied that he sold stolen animals, was dishonest and a thief, and lied about the source of his animals.  Alleging that this report damaged him personally as well as professionally, Toney requested compensatory as well as punitive damages in an amount over $50,000.

WCCO moved to dismiss Toney's amended complaint, or in the alternative, for judgment as a matter of law.  After holding oral argument, the district court first rejected Toney's defamation claim, ruling that the statements in the report about Toney were either true or non-defamatory.  The court then held that, because Minnesota did not provide a claim for relief based on defamation by implication, WCCO was also entitled to summary judgment on Toney's implied defamation claims.  Toney filed this timely appeal.

---

[1]On appeal, WCCO moved to supplement the record to include an Administrative Law Judge's opinion finding that Toney falsified his records.  However, as we limit out review to the district court's ruling in this case, we deny WCCO's motion, reserving its right to renew this motion before the district court.

III.    DISCUSSION

A.    APPLICABLE LAW AND STANDARD OF REVIEW

Because this case arises under this court's diversity jurisdiction, the substantive issues are governed by Minnesota law. *B.B. v. Continental Ins. Co.,* 8 F.3d 1288, 1291 (8th Cir. 1993). Thus, our task is to determine and apply Minnesota law. *Farr v. Farm Bureau Ins. Co.,* 61 F.3d 677, 679 (8th Cir. 1995). Of course, Minnesota courts must apply federal constitutional standards that are applicable to cases like this. In this regard, it is conceded that Toney is not a public figure; rather, he is a private plaintiff in this defamation case.

We review the district court's interpretation of Minnesota law *de novo. Id.* We also review *de novo* the district court's grant of WCCO's motion for summary judgment. *Continental Ins. Co.,* 8 F.3d at 1291. Summary judgment for WCCO is proper "if there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).

B.    **DEFAMATION AND DEFAMATION BY IMPLICATION**

Count 1 of Toney's complaint alleges defamation; Court 2 alleges defamation by implication. To prevail on either of these claims, Toney must prove that WCCO's publication about him defamed him by establishing that WCCO (1) published a statement of fact; (2) of and concerning him; (3) which was false; and (4) damaged his reputation and lowered his estimation in the community. *See Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 886 (Minn. 1986); *Foley v. WCCO Television, Inc.,* 449 N.W.2d 497, 500 (Minn. Ct. App. 1989), *cert.* denied, 497 U.S. 1038 (1990).

Under Minnesota defamation law, a statement falls into one of three categories: (1) those that are clearly defamatory on their face; (2) those that could not possibly have a defamatory meaning; and (3) those that are reasonably susceptible to a defamatory meaning as well as an innocent one. *Church of Scientology v. Minnesota State*

4

*Medical Ass'n Found.,* 264 N.W.2d 152, 155 (Minn. 1978). In category (3) are "[w]ords, which taken by themselves have an innocent meaning, [but] in connection with surrounding circumstances[] may convey a defamatory meaning to those familiar with such circumstances . . . . [In such cases,] [w]hether a defamatory meaning is conveyed is dependent upon how ordinary men understand the language in light of the surrounding circumstances." *Gadach v. Benton County Co-op Ass'n,* 53 N.W.2d 230, 231 (Minn. 1952) (citations omitted). "If the words are capable of the defamatory meaning, it is for the jury to decide if they were in fact so understood." *Utecht v. Shopko Dep't Store,* 324 N.W.2d 652, 654 (Minn. 1982) (citing *Gadach,* 53 N.W.2d 230). Thus, at the summary judgment stage, the judge must not conclusively interpret a category (3) statement; rather, the judge should only decide whether a statement is capable of being interpreted as defamatory.

When an otherwise innocent statement is interpreted to have a defamatory meaning, it is not unusual to find that meaning referred to as "implied" or "drawn by implication." *See, e.g., Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."); id. at 3 (holding actionable article "implying that petitioner . . . lied under oath in a judicial proceeding"); *Phipps v. Clark Oil & Refining Co.,* 408 N.W.2d 569, 573 (Minn. 1987); *Lewis,* 389 N.W.2d at 889; *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1304 (8th Cir.) (en banc), *cert. denied,* 479 U.S. 883 (1986). In the instant case, the district judge held that Minnesota does not recognize "defamation by implication." The district judge, however, could not have meant to preclude plaintiffs from challenging statements that are non-defamatory on their face but capable of having an "implied" defamatory meaning for it is well accepted that such statements may give rise to a defamation claim under Minnesota law, and we see nothing in the district court's opinion that discards such well settled law. For example, in *Utecht v. Shopko Dep't Store,* the Minnesota Supreme Court

held actionable a department store's placement of a notice at the cash register stating "Shopper's Charge-Robert Utecht-Do Not Accept." 324 N.W.2d at 653-54.[2]  In *Shopko,* the court explained that "[t]he circumstances in which the notice was seen by the public necessarily prompted speculation as to why the [" Shopper's Charge "] card was not to be accepted. Loss or theft are possible explanations but poor credit is an at least equally likely alternative. "Id.  at 654;[3]  *see also Gadach,* 53 N.W.2d at 232 ("A jury might well find that this article imputed to plaintiff a crime."); *Phipps,* 408 N.W. 2d at 573 (statement could imply that gas attendant refused to service customer because she was handicapped).

What Minnesota law refers to as "defamation by implication" occurs when a defendant " '[1]  juxtaposes a series of facts so as to imply a defamatory connection between them, or [2] creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.' "*Diesen v. Hessburg,* 455 N.W.2d 446, 450 (Minn. 1990) (quoting W. Page Keeton, et al., PROSSER & KEETON, LAW OF TORTS § 116, at 117 (Supp. 1988)), *cert. denied,*  498 U. S. 1119 (1991).  Thus, the touchstone of implied defamation

---

[2]The classic example of this type of defamation was "Horace Greeley's well-known words concerning James Fenimore Cooper, 'He will not bring the action in New York, for we are known there, nor in Otego, for he is known there' [which] were held to carry the imputation of bad repute in Otego."  W. Page Keeton etal., PROSSER & KEATON ON THE LAW OF TORTS § 111, AT 781 (5th ed. 1984) (quoting Cooper v. Greeley, 1 Denio 347, 348 (1845)).

[3]Notably, the interpretation of the challenged statement in *Shopko*-i.e., the determination that it was susceptible to a defamatory meaning-relied on extrinsic circumstances.  The Minnesota Supreme Court acknowledged this fact and explained that such cases are action- able, terming them cases of "defamatory innuendo."  324 N.W. 2d at 653-54.  Employing the term "defamatory innuendo" to describe such cases can be confusing because in common usage, the terms "innuendo" and "implication" are often used synonymously (somewhat like "implica- tion" and "interpretation"); however, in the common law of defamation, they are "critically different."  Robert D. Sack & Sandra S. Baron, LIBEL, SLANDER, AND RELATED PROBLEMS, 88-89 (2D ED 1994).

claims is an artificial juxtaposition of two true statements or the material omission of facts that would render the challenged statement(s) non-defamatory. Under this definition, a defendant does not avoid liability by simply establishing the truth of the individual statement (s); rather, the defendant must also defend the juxtaposition of two statements or the omission of certain facts.

Perhaps the quintessential modern case of defamation by implication is *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412, 419-20 (Tenn. 1978), where the court held liable a newspaper that truthfully reported that a woman, upon finding her husband at plaintiff's home, shot the plaintiff. In that case, the article neglected to mention that the plaintiff was hosting a social gathering at the time, thereby implying that the plaintiff and the suspect's husband were having an affair. Id. at 420. Moreover, the court held that truth of the challenged statements was irrelevant because" [t]ruth is available as an absolute defense only when the defamatory meaning conveyed by the words is true." Id.

C.   **TONEY'S DEFAMATION CLAIM**

The district court identified seven statements that the broadcast made about Toney: "The Plaintiff is a Class B dealer of dogs; two, the Plaintiff buys dogs and sells some, and among those sold, sales are made to the University of Minnesota; three, according to the USDA's records, the Plaintiff supplies some thousand dogs per year to the University; four, it's the Plaintiff's estimate that the University is approximately 20 percent of his business; five, the Plaintiff asserts and states that he seldom gets animals from dog pounds; six, the Plaintiff's 1990 USDA records show that he was telling the USDA information contrary to that which he had set forth; seven, the USDA confirmed that Plaintiff was under investigation for falsification of his records." App. at 37.

The first five statements, the district court ruled, "are  not only true, but they do not appear in any fashion as a matter of  law

to be defamatory." Id. at 38. The court also ruled that the sixth statement, that Toney had told the USDA something contrary to what he had told the station's reporter, "could be defamatory," as was the case with the seventh statement that Toney was under investigation for falsification of his records on file with the USDA. Id. at 39. But these two statements, the district court concluded," [we]re not actionable . . . . because each is true." Id.

We do not disturb the district court's ruling that none of the first five statements was defamatory in and of itself. Similarly, we accept the court's ruling that the first four statements were literally true. We shall deal below with whether the district court erred by ruling that statement five was true, but we accept its judgment that statement five was not defamatory on its face even if false.

The district court also held that statements six and seven "could be defamatory," meaning, we suppose, that if otherwise actionable, whether the statements were defamatory would be questions for a jury. Since both statements could be interpreted as impugning the honesty of Toney's business dealings, we agree with the district court's characterization of these statements.[4]

Even if defamatory, the district court held statements six and seven not actionable because they were true as a matter of law. We accept this ruling with respect to the seventh statement, but not with regard to statement six-i.e., that Toney's 1990 records filed with the USDA showed that Toney was telling the government something contrary to what Toney had reportedly said in statement five: that he seldom gets dogs from dog pounds. For the reasons stated below,

---

[4]In doing so, we note our observation made in Part III B that the possible defamation involved in the two statements could not have been deemed by the district court to be defamation by implication since the court proceeded to hold that there were no such cause of action under Minnesota law.

8

we doubt that statement six was so plainly true that it could be so characterized as a matter of law.

First, we question whether the four pages exhibited from the 1990 records show that for that year Toney could not reasonably assert that he only "seldom" got dogs from pounds. As Toney argued during the hearing in district court, he handled some 5,000 dogs in 1990, and even if each of the 20 entries on the four pages of record relied on by WCCO indicated that he did get dogs from pounds, that fact would not show that his business with pounds in 1990 occurred more often than "seldom." App. at 27-28. Moreover, we note that, in a colloquy with counsel, the district judge observed that the "question of whether or not it's seldom, I guess, becomes kind of an open question." App. at 27. Toney's counsel responded: "Yeah, which is a fact question. That's our whole point." Id.

Second, even if the filed records for 1990 could establish that Toney dealt with pounds more often than seldom, the interview with Toney which contained statement five was held in 1992, and his reported statement was that he seldom "gets" dogs from pounds. Thus, it is at least doubtful that what was true in 1990 was also true in 1992.

Third, in his affidavit opposing summary judgment, Toney swore, and maintains on appeal, see Brief of Aplt. at 17, that he did not "state to WCCO-TV that I seldom got my dogs from pounds as alleged   or asserted in the televised report.  I explained the source of each and every dog that was questioned or inquired about by the WCCO reporter.  " App. at 49. Laurie Stern, the producer of the program, filed an opposing affidavit stating that "Julian Toney told me during the interview that he rarely obtained dogs from dog pounds." Supp. App. of Aplee. at 11. Aside from the significant use of the word "rarely" in place of the word "seldom" (the word allegedly used by Toney in the interview), the two affidavits are in conflict. Of course, if Toney never made statement five, it could hardly be termed true, as the district judge held; and, if never made, WCCO's

fabrication of the statement only compounds the possible defamation.

On appeal, Toney claims that, at the very least, the conflict between the two affidavits should be resolved by a jury, not by the district judge's ruling that, as a matter of law, statement five was in effect made and was true. In explaining his ruling on this point, the district judge said:

> Now, according to the pleadings, many of the above statements were supplied by the Plaintiff himself in an interview. Whatever the source, the first five statements do not appear to be in contest. They are in fact true by all assertions. There is some question exactly whether or not he made exactly the statements, but there is no substantial dispute about the actuality. He said he seldom gets animals from dog pounds, and all the rest of those facts, I think, are clearly agreed to be stated as they have been stated.

App. at 37-38.

This is hardly a crystal clear basis for the resolution of conflicting affidavits at the summary judgment stage. Even if the judge had a satisfactory, but unstated, explanation for holding that Toney uttered statement five, that explanation would fall considerably short, as indicated above, of establishing the truth of statement six--i.e., that statement five is inconsistent with the records filed with the USDA for 1990.

Thus, we cannot affirm the judgment granting WCCO's motion for summary judgment on the defamation count of the complaint insofar as it deals with statement six. To that extent, we reverse the district court's judgment on Toney's defamation claim and remand this case for further proceedings consistent with this opinion. We otherwise affirm the district court's disposition of Toney's defamation claim.

10

D.    MINNESOTA LAW ON DEFAMATION BY IMPLICATION


As indicated above, the district court held that Minnesota law does not provide a cause of action for defamation by implication. We have also pointed out that we do not interpret this ruling as applying to statements that are not defamatory on their face but could convey a defamatory meaning. If it did so apply, we indicated that we could not agree. The court's ruling, however, clearly applies to the category of implied defamation described by Prosser & Keeton and repeated by the Minnesota Supreme Court in *Diesen,* 455 N.W.2d at 450. *See* p. 6, *supra.* We conclude that the district court erred in this respect.


At one point during its oral opinion, the district court said that "the State of Minnesota in no reported case has ever recognized slander by implication. " App. at 41. This statement might be read to mean that if the Minnesota Supreme Court had not expressly provided such a cause of action, this was the end of the search for Minnesota law. As we recently underscored, however, the determination that the state supreme court has not decided the relevant legal question only begins--rather than ends--our inquiry:

> If [a State's] Supreme Court has not addressed the issue, we must determine what that court would probably hold were it to decide the issue. In making this determination, we may consider relevant state precedent, analogous decisions, considered dicta, scholarly works and any other reliable data.

*Farr,* 61 F. 3d at 679 (citing *Continental Ins. Co. ,* 8 F.3d at 1291).


In the end, however, the district court held that in *Diesen, supra,* the Minnesota Supreme Court had "rejected a slander by implication claim." App. at 41. The trial court was also of the view that the Eighth Circuit had twice before done so, *see Price v. Viking Penguin Press,* 881 F.2d 1426, 1432 (1989), *cert. denied,* 493

11

U.S. 1036 (1990); *Janklow,* 788 F. 2d at 1304, id. , and hence declined "to recognize the cause of action which has been rejected in this circuit and in the Minnesota Supreme Court." App. at 42.

We disagree with the district court's reading of *Diesen.* In that case, a county attorney (Diesen) claimed that a newspaper published a series of articles that defamed him by implication through inaccurately portraying his prosecution of domestic violence. The jury found for Diesen on the ground that "the implication of the articles published by [the newspaper was] substantially false. "455 N.W.2d at 449 (internal quotations omitted). The trial court overturned the jury verdict on a motion for JNOV, finding that the statements in the article were true as a matter of law and were constitutionally protected opinion. The Court of Appeals reinstated the jury verdict, noting that the omission of certain facts created a false and defamatory implication. Finally, the Minnesota Supreme Court reversed the Court of Appeals, holding that "an allegedly false implication arising out of true statements is generally not actionable in defamation to a public official." Id. at 452. Although there was a judgment to this effect, it remains arguable whether there was a majority opinion to support it.[5] For

_____

[5]In the wake of *Diesen,* the status of defamation by implication actions brought by public figures remains unclear. At first blush, *Diesen* appears to command a majority for Part II of Chief Justice
Popovich's opinion. That is, two judges joined the entirety of Chief Justice Popovich's opinion and Justice Simonett, concurring specially, joined Part II of that opinion. (Justice Coyne concurred only in the judgment and two other Justices dissented.) Part II set forth three grounds for reversal: (1) public officials have no cause of action sounding in defamation by implication (at least as defined by Prosser & Keaton); (2) the claimed defamation by implication was constitutionally protected opinion; and (3) the published material was privileged under state defamation law. Although the first sentence of Justice Simonett's concurring opinion states that he concurred in Part II of the Chief Justice's opinion, the remainder of his concurrence explained that plaintiff's cause of action failed because he did not establish that the articles omitted certain "predicate facts" that "would have refuted the implication of prosecutorial unfitness," id. at 455-a view consistent with the theory of defamation by implication. Picking up on this inconsistency, one commentary

12

present purposes, however,

_____

stated that "it questionable whether a majority [of the *Diesen* court] actually endorsed" the rule that public figures cannot maintain an action for defamation by implication.  C. Thomas Dienes & Lee Levine, *Implied Libel, Defamatory Meaning, and State of Mind: The Promise* of New York Times v. Sullivan, 78 Iowa L. Rev. 237, 307 n.349 (1993) .

Not surprisingly, Diesen has left courts and commentators confused over the exact status of public figure defamation by implication actions.  *See Conroy v. Kilzer,* 789 F. Supp. 1457, 1460 (D.  Minn. 1992) ("Given the fragmentation of the Diesen court, it is difficult to state with certainty Minnesota's rule regarding libel by implication.") . Some commentators take *Diesen* at face value, accepting its repudiation of public figure defamation by implication actions. *See, e.g.* , Dienes & Levine, *supra,* 78 IOWA L. REV. at 306.  Others, possibly in light of Justice Simonett's concurrence, read *Diesen as* joining those courts that have limited public figure defamation by implication claims to those where a media defendant omits a specific statement that would have refuted the defamatory implication.  See, e.g., Sack & Baron, *supra,* at 87 n.100. Yet other commentators, noting that Diesen ruled on several grounds and commented that defamatory implications are generally not actionable by public officials, highlight that *Diesen* does not" foreclose completely the possibility that true statements creating a false impression [through an artificial juxtaposition or omitted facts] could fulfill the requirement of falsity." Kathryn S. Banashek, Comment, *Can A Public Figure* Win A *Libel Suit When The Media Reported the Truth?-Defamation and False Impressions,* 69 WASH. U. L.Q. 1009, 1019 (1991) . Nonetheless, regardless of what Diesen portends for defamation by implication actions by public figures, it does not preclude private persons from advancing such claims.

13

we will assume that the sentence just quoted, taken from Chief Justice Popovich's opinion, represented the views of a majority of the Minnesota Supreme Court.

After quoting Prosser and Keeton's definition of implied defamation claims, the Chief Justice's opinion explained that "this reference is to common law libel in the absence of constitutional concern for fair comment on public officials. The United States Supreme Court has established an important distinction between private and public official plaintiffs for defamation purposes." 455 N.W. 2d at 450. Moreover, in excluding comments about public officials from the scope of actionable defamation by implication, Diesen invoked *New York Times Co. v. Sullivan,* 376 U.S. 259, 270 (1964), and explained

that criticism of public officials "is a necessary and positive element of our democracy and, as a result, a public official may suffer injury to his or her professional reputation without recovery under defamation law because of the paramount free speech and free press rights at stake." *Id.* *Diesen* did not dispute Prosser & Keeton's description of the common law's acceptance of defamation **by** implication; rather, it simply held the common law rule inapplicable to public officials. The Chief Justice's opinion also relied on the Eighth Circuit's decisions in Price *and* Janklow, which it viewed as rejecting actions for defamation by implication brought by public figures, id. at 451; as we see it, the opinion interpreted those cases as precluding only those implied defamation actions brought by public officials.

Although a federal district court interpreted Diesen as rejecting defamation by implication claims for both private and public figures, *see Kortz v. Midwest Communications, Inc.,* 20 Med. L. Rep. 1860, 1865 (D. Minn. 1992), we read *Diesen* as in no way questioning whether private persons can bring implied defamation claims. This was true of the Chief Justice's opinion as well as the opinions of the concurring and dissenting Justices.

Had the majority opinion in Diesen intended to negate a cause of action for the kind of implied defamation at issue here (i.e., private plaintiff cases), it seems odd that it did not mention or comment on *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569 (Minn. 1987), decided three years before Diesen and affirming the judgment of the Minnesota Court of Appeals, 396 N.W.2d 588 (Minn. Ct. App. 1986) . That case, as we read it, involved a defamatory implication created by omitted facts. The facts of the case, taken from those recited by the Court of Appeals, are these:

> Mark A. Phipps was employed by Clark Oil Refining Corporation as a cashier at a self-service gas station. On November 17, 1984, a customer drove into the station and asked him to pump leaded gasoline into her 1976 Chevrolet-an automobile equipped to receive only unleaded gasoline. Phipps' manager, respondent Leroy Chmielewski,

told Phipps to comply with the customer's request, but Phipps refused, believing that dispensing leaded gasoline into the gas tank was a violation of law. See Clean Air Act, 42 U.S.C. § 7401-7642. Phipps was willing to pump unleaded gas into the customer's automobile; nevertheless, Chmielewski immediately fired him.

In response to an inquiry by the Minnesota Pollution Control Agency, Clark Oil's management stated that Phipps was fired because he had been rude to customers on several occasions and "may have refused to provide full service to a handicapped customer."

Phipps brought this action against his employers (referred to collectively as Clark Oil), seeking damages for wrongful termination and defamation. Clark Oil moved for judgment on the pleadings . . . . The trial court granted Clark Oil's motion, stating that Minnesota law allowed Phipps, an employee-at-will, to be terminated for any reason or for no reason. The court found that the statement explaining Phipps' discharge was not defamatory as a matter of law because it was not the type of statement which tended to injure Phipps' reputation in the community. Further, the court held that Phipps had, by the allegations in his complaint, admitted the truth of the statement.

396 N.W.2d at 589-590. The Court of Appeals reversed, holding that in these circumstances public policy required an exception to the right of an employer to discharge at-will employees and that significant fact issues underlay the defamation claim so as to foreclose dismissal on the pleadings. Id. at 595.

The Supreme Court of Minnesota unanimously affirmed that judgment. The court noted Phipps, insistence that the employer's statement implied that he discriminated against the customer because she was handicapped. 408 N.W.2d at 573. The court ruled that since truth as a defense goes to the underlying implication of the defendant's statement, judgment for Clark Oil was erroneous if the statement "may be defamatory if false." Id.

As for being defamatory, the court outlined the principle set forth earlier that words may be divided into those that cannot possibly have a defamatory meaning, those that may reasonably have a defamatory

16

meaning as well as an innocent one, and those that are clearly defamatory on their face. id. (quoting *Church of Scientology,* 264 N.W.2d at 155) . The Phipps court underscored that the words at issue must be given their obvious and natural meaning, and held that Clark Oil's explanation for firing Phipps could be found to have a defamatory meaning. *Id.* As for the falsity of the alleged "underlying implication," the court noted that Phipps asserted that the customer's car was designed for unleaded fuel only, which he was ready to dispense, but the customer insisted on leaded gasoline which Phipps refused because it was against federal law. The court thus concluded that judgment on the pleadings was inappropriate. Id.

It is evident from the Phipps opinion that what made the oil company's statement arguably defamatory was that it could be taken to imply that Phipps refused service because the customer was handicapped. Furthermore, what made the statement reasonably defamatory was the withholding of facts which, if disclosed along with the statement, would have foreclosed the defamatory inference; moreover, those facts would also have rendered that inference false.[6] We accordingly conclude that the Minnesota Supreme Court has already recognized a cause of action for cases where the defamatory implication arises from omitted facts.

Even if we read *Phipps* as leaving open whether the Minnesota Supreme Court would extend a cause of action to a private plaintiff alleging defamation by implication as described by Prosser & Keeton, we still conclude that the court would recognize a cause of action for implied defamation where a defendant omits important facts or

---

[6]Neither party to this appeal cited the *Phipps* decision in the Minnesota Supreme Court. However, both parties did reference the Minnesota Court of Appeals decision. See Brief of Aplee. at 20 n.10; Brief of Alt. at 8. Appellee's cursory remarks about the case are not altogether accurate, but as a whole they are not inconsistent with the proposition that the *Phipps* case fits the description of implied defamation by omitting material facts.

17

where the defendant juxtaposes a series of facts so as to imply a defamatory connection between them.  Our reasons are these:

1.    Importantly, none of the Justices in *Diesen* questioned that the Prosser & Keeton statement represented the common law, which is evidenced by the lack of controlling authority limiting the availability of such a cause of action to a private plaintiff.  Moreover, the common law historically recognized defamation by implication as it broadly framed the inquiry as whether the publication contains a defamatory meaning.  *See* PROSSER & KEETON ON THE LAW OF TORTS, *supra, §* 111, at 780-781.  Thus, " [a] publisher is, in general, liable for the *implications* of what he or she has said or written, not merely the specific, literal statements made.  "Robert D. Sack & Sandra S. Barron, LIBEL, SLANDER AND RELATED PROBLEMS 85 (2d ed. 1994).

2.    For its holding that a private plaintiff has no cause of action for defamation by implication, the district court relied not only on *Diesen*, erroneously we think, *supra* at 12, but also on *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1432 (8th Cir. 1989), *cert. denied*, 494 U.S. 1036 (1990) , and *Janklow v. Newsweek, Inc.* , 788 F. 2d 1300, 1304, (8th Cir. 1986) (en banc), cert. denied, 479 U.S. 883 (1986) . As decisions of this circuit, one of which was en banc, we certainly give them considerable weight in determining how the Minnesota Supreme Court would decide the issue we are pursuing.  For three reasons, however, we find the district court's reliance on these two cases unpersuasive.  First, as we have observed, *supra* at 14, Chief Justice Popovich's opinion in *Diesen cited Price and Janklow* only for the proposition that public figures may not sue for defamation by implication.  Second, we do not read either *Price* or *Janklow* as holding that even public figures can never maintain such a  cause of action.  Third, even if we are wrong in our reading of *Price* and *Janklow,* those cases would no longer control our analysis in the wake of *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990).

18

In *Janklow,* the Governor of South Dakota brought a defamation action against Newsweek magazine.  The district court held that the claimed defamatory material was protected opinion under the First Amendment.  This court, sitting en banc after a panel reversed the district court, agreed with the district court that the alleged libel was protected opinion.  In arriving at that conclusion, the court employed a four-factor analysis for determining whether a statement constitutes fact or protectible opinion.  Id. at 1302-03. As to the first factor of this inquiry, precision and specificity, *Janklow* explained that the defamatory meaning attributed to the statement at issue could only be drawn by "implication," explaining that the challenged "sentence was not nearly so precise as a direct accusation." Id. at 1304.  Because the defamatory meaning was not apparent on the face of publication, i.e., could only be drawn by implication, *Janklow* concluded that the challenged statement's relative imprecision counselled in favor of viewing the statement as protected opinion.  After examining the other three factors, Janklow ruled that the statement at issue was an opinion protected by the First Amendment.

In our view, *Janklow's* discussion of the precision and specificity factor of its four-part inquiry does not hold that all defamatory implications are necessarily too imprecise to be considered factual and not opinion.  But as will be seen, Price appears to hold otherwise.  However that may be, *Janklow* emphasized that the four factors "must be considered together, that no solitary criterion can be dispositive, and that ultimately the decision whether a statement is fact or opinion must be based on all the circumstances involved." Id. at 1304.  Thus, had *Janklow* held that the three other factors besides precision and specificity indicated that the statement at issue was not a protected opinion, the discussion of the first factor would have become irrelevant.  The Governor could then have relied on the traditional rule that plain words, even if seemingly innocent, may carry an actionable defamatory implication.  And, of course, a private plaintiff could similarly rely on this rule.

19

In *Price*, FBI agent David Price claimed that a book written about his conduct at the Pine Ridge Indian Reservation in South Dakota defamed him in various ways. To determine whether some or all of the allegedly defamatory statements were protected opinion, the Price court applied *Janklow's* four-factor test. In analyzing the first factor, precision and specificity, the Price court, citing *Janklow* 788 F.2d at 1304 said, "We do not recognize defamation by implication. "Although the district court viewed this sentence as relevant to the instant case, as we see it, this sentence applies only in the process of applying factor one. It does not apply where the statement at issue is plainly factual or is held not to be protected opinion. This sentence does indicate that *Janklow* held that in applying factor one, no defamatory implication from the plain words of the statement at issue is ever permissible. Price's discussion, 881 F.2d at 1439-1440, of the allegedly defamatory treatment in the book of the testimony of a government witness, Louis Moves Camp, supports that reading of *Janklow.* *Price,* however, did not purport to depart from *Janklow's* holding that no one of the four factors is dispositive in the fact/opinion inquiry. Hence, as we said about *Janklow, supra,* at 18, the lack of precision of a statement cannot itself determine whether it is protected opinion because the other three factors could lead to the conclusion that the statement is not a protected opinion and is subject to the ordinary rule in defamation cases--that is, that the plaintiff may support his case by relying on a reasonable implication from the plain language of a particular statement or statements.

Finally, even if the *Janklow/Price* opinion analysis would necessarily bar all defamation by implication claims (a suggestion we emphatically reject), in light of *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19 (1990), we are no longer bound to that result. In *Milkovich,* the Supreme Court rejected "the number of factors developed by lower courts" used to provide constitutional protection for opinion. This development was "in mistaken reliance" on the dictum in *Gertz v. Robert Welch* that "under the First Amendment there is no such thing

20

as a false idea." 418 U.S. 323, 339-40 (1979).  *Milkovich* explained that the existing constitutional doctrines provided for the necessary "breathing space" for freedom of expression, that a dichotomy between fact and opinion was artificial, and that "an additional separate constitutional privilege for 'opinion', [was] not required to ensure the freedom of expression guaranteed by the First Amendment."  497 U.S. at 21.  Instead, for a statement to be actionable, the inquiry

is whether the statement is factual and provable.[7]  Accordingly, even if *Janklow* or *Price* suggested that implications[8] are constitution-

---

[7]The relevant commentary appears to have also reached this conclusion.  For example, Abner Mikva, former chief Judge of the D.C. Circuit, stated that *Milkovich* implicitly rejected the four factor "totality of the circumstances" test in favor of a single inquiry into whether the alleged defamatory statement is actionable.  Abner J. Mikva, *In My Opinion Those Are Not Facts*, 11 Ga. St. U. L. Rev. 291, 299 (1995); see also David M. Cohn, Comment, *The Problem of Indirect Defamation: Implication, and innuendo*, 1993 U. Chi. Legal F. 233, 239-40 (1993) ("*Milkovich* forecloses [the analysis taken by price]; under *Milkovich*, the statements [at issue in Price] would not have qualified as protected opinion because the charges were provable as false."); Lisa M. Montpetit, Comment, *Changes in Defamation Law for the Eighth Circuit*, 17 Wm. Mitchell L. Rev. 785, 814 (1991) (*Janklow* test is "obsolete" and "has been replaced").

Nonetheless, even if the *Janklow* four-factor test is no longer dispositive, some courts have bound it instructive in determine whether a statement is capable for being proved false.  See *McGrath v. TCF Bank Savings, FSB*, 502 N.W. 2d 801, 808 (Minn. Ct. App.) (four factor test "helpful"), *modified on other grounds*, 509 N.W.2d 365 (Minn. 1993); *Huyen v. Driscoll*, 479 N.W.2d 76, 80 (Minn. Ct. App. 1991) (*Milkovich* narrowed scope of opinion privilege, but four factor test "instructive"); *Isnel K. Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990) (even though *Milkovich* overruled prior analysis, the four factor test still "relevant" in discerning whether a statement is provable as false).

[8]Again, we note that *Janklow, Price,* and *Milkovich*  all used the concepts of "implication" and "interpretation" interchangeably.  For example, Price explained that "[w]hile Price attaches an *implication* to the sequence of events as the book presents them, it is obvious that more than one interpretation is possible."  881 F.2d at 1439 (emphasis added); *see also id.* at 1432 N.4 ("a state may not

ally suspect, *Milkovich* made clear that implications, like plain statements, may give rise to a defamation claim. Indeed, Milkovich ultimately held that "a reasonable fact finder could conclude that
the statements [at issue] imply an assertion that petitioner Milkovich perjured himself . . . . [and that] th[is] connotation is sufficiently factual to be susceptible of being proved true or false." Id. This holding applies to public officials as well as to private plaintiffs. *See Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655,* 39 F. 3d 191, 196 (CA8 1994).[9]

   3.    We note also that earlier in the *Price* opinion, the court said that "[w]here the plaintiff is not a public figure, a different balance is struck." 881 F.2d at 1430 (citations omitted). That is, where private plaintiffs are concerned, there are no considerations comparable to those that limit redressing defamatory implications where public officials or public figures are plaintiffs, surely none powerful enough to outweigh what most people consider a major factor in a satisfactory existence-their reputation. We have no reason to think that

---

impose liability simply because clearer language or the inclusion of additional reports would rule out an objectionable implication."). However, while *Price* clearly viewed accusations "drawn by implication" to be more readily protectible as opinion, *Milkovich* made no such
distinction, explaining that "the statement 'In my opinion, Jones is a liar' can cause as much damage as the statement 'Jones is a liar.'" 497 U.S. at 19.

   [9]After invoking *Milkovich, Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655* recognized that implications may give rise to a defamation claim insofar as they were provable as false; that is, *Beverly Hills* explained: "Because the statement contained in the handbill was not a false statement of fact, *nor could it reasonably be read as such*, the statement must necessarily be characterized as nondefamatory." 39 F. 3d 191, 196 (CA8 1994) (emphasis added).
   Furthermore, based on his view that the Supreme Court had implic- city rejected the fact/opinion dichotomy, Justice Yetka's *Diesen* dissent explained that: "Because the 'We do not recognize defamation by implication' statement in *Price*, 881 F.2d at 1432, was made in connection with the *Janklow/Ollman* opinion analysis, it has been [implicitly] rejected by the United States Supreme Court and should, therefore, be rejected by this court." 455 N.W. 2d at 462.

22

the Minnesota Supreme Court would feel otherwise.

4.    One of the two parts of Prosser & Keeton's definition of common law defamation **by** implication is the omission of facts; that is, had the facts been stated, there would have been no defamation.  In such a case, as in *Phipps,* the challenged statements, or as they reasonably would be understood, defamed the plaintiff, who claims that they are defamatory and false by virtue of omitted facts.  Especially since it is now the private plaintiff's burden to prove falsity, at least in cases dealing with a matter of public interest, surely the plaintiff should and would be permitted to prove a statement false by revealing the facts omitted by the publisher.  To hold otherwise would allow publishers (i.e., would-be-defamers) to accomplish indirectly what they could not do directly.

5.    The juxtaposition of facts in such as way as to imply a defamatory connection between them is the other part of the Prosser & Keeton definition of defamation by implication.  As to this part, we are not in position to make a *Phipps*-like claim that a Minnesota Supreme Court decision so closely satisfied the classic description of this type of defamation by implication as to settle the issue.  We must therefore predict how the Minnesota Supreme Court would rule on the issue.  Of course, if the actionability of defamation by omitting facts has been settled by *Phipps,* that would perhaps persuade the court also to approve the other part of Prosser & Keeton's definition of implied defamation.

6.    We are also persuaded by a decision in the Minnesota Appeals Court that was cited by the dissenting opinion in *Diesen*.  That case, *Karnes v. Milo Beauty and Barber Supply Co.,* 441 N.W.2d 565 (Minn.  Ct. App. 1989), closely tracks the juxtaposition brand of implied defamation.  In that case, Milo, a cash and carry store, began to suspect employee theft.  Maddox, the head of accounting and auditing, ultimately wrote a note to his superior indicating that store 190 continued to have unsigned void slips whose sales were not rerung. The memo listed by day the number of voids and the total amount of the voided sale.  The memo concluded:

Store # 190 is taking (stealing) money from the cash register drawer. How much more noncompliance must we tolerate from Nan Karnes?

Id. at 567. The memo was circulated to several people including Karnes' immediate supervisor, who was instructed to terminate Karnes. This occurred, and Karnes brought suit, claiming defamation based on the Maddox memo. A jury returned a special verdict for Karnes. Milo appealed, challenging the verdict as, *inter alia,* manifestly contrary to the evidence. The court rejected this challenge:

> In his first statement ("Store # 190 is taking (stealing) money from the cash drawer"), Maddox does not directly accuse Karnes of theft. He nevertheless accuses Store # 190, which presumably could be anyone employed by the store . . . . The next sentence ("How much more noncompliance must we tolerate from Nan Karnes? ") directly accuses Karnes of "noncompliance", presumably with store procedures . . ' these statements could be interpreted by a jury as implying that Karnes was either stealing or allowing stealing to take place.

Id. at 568. Recognizing that Milo's defense of truth did not go to the underlying implication, the Court of Appeals did not disturb the jury verdict in this respect.[10]  441 N.W.2d at 568 (citing *Lewis,* 389 N.W.2d at 889).

7.    Finally, we conclude that Minnesota law would allow for implied defamation claims based on the artificial juxtaposition of two statements on the ground that defamation law traditionally has required a statement to be construed in light of a document as a whole. A basic rule of defamation law is that courts must construe a statement in light of its context and surrounding circumstances. See *Jadwin v. Minneapolis Star and Tribune Co.,* 367 N.W.2d 476, 491 (Minn. 1985) (citing Restatement (Second) of Torts § 563 comment d (1976)). In

---

[10]Karnes lost the case, however, because Milo had a privilege which Karnes did not negate by successfully proving actual malice.

*Tawney v. Simonson, Whitcomb & Hurley Co.* , the Minnesota Supreme Court set forth this well established principle:

> The question is not whether that article can be divided into two parts, and each of those parts so analyzed separately from each other that each would appear to be free from defamatory meaning. The article must be construed as a whole.

124 N.W. 229, 233 (Minn. 1909) In our view, the natural corollary to this rule is that two artificially juxtaposed statements can give rise to an actionable implication. Put differently, we cannot conclude that Minnesota law would distinguish between (1) a private person who was defamed by a single statement that became defamatory when read in context; and (2) a single statement that created a defamatory implication when artificially juxtaposed with another statement.[11]

## IV. CONCLUSION

In sum, we AFFIRM in part and REVERSE in part the district court's judgment that WCCO deserved judgment as a matter of law on Toney's defamation claim. We REVERSE the district court's judgment that Minnesota law does not provide private persons with a claim for defamation by implication. This case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

---

[11]Thus, in pursuing on remand the "juxtaposition" brand of defamation by implication, Toney may rely on parts of the broadcast other than the seven statements listed by the district court in passing on his defamation claim and dealt with in Part IIIC, *supra.*

26