_____

No. 95-3473
_____

Lundell Manufacturing Company,    *
Inc.,                             *
                                  *
                                  *
        Plaintiff - Appellant,    * Appeal from the United States
                                  * District Court for the
                                  * Northern District of Iowa.
    v.                            *
                                  *
American Broadcasting Companies,  *
Inc.,                             *
                                  *
        Defendant - Appellee.     *


_____

           Submitted:  April 10, 1996

             Filed:  October 15, 1996
           _____

Before WOLLMAN, JOHN R. GIBSON,    and HANSEN, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.


     Lundell Manufacturing Company appeals from the district court's order granting American Broadcasting Companies judgment as a matter of law, and setting aside a jury verdict of just over one million dollars for Lundell on its libel action.  ABC broadcast a story on "World News Tonight with Peter Jennings," reporting that a garbage recycling machine manufactured by Lundell "does not work."  Lundell sued for libel, a jury returned a verdict in its favor, and the district court set aside the jury verdict. On appeal, Lundell argues that the district court erred in setting aside the jury verdict because there was substantial evidence that

the "sting" of the defamatory statement was false.  Lundell also contends that the court erred in setting aside the lost profits award because there was evidence of lost profits damages.  We reverse.

On July 2, 1992, ABC broadcast a story on "World News Tonight with Peter Jennings" as part of the program's continuing "Anger in America" reports.  Jennings introduced the story:

> Our final report tonight is about garbage, which in the case of a small rural county in Georgia, is making an awful lot of people angry.  What we have here is another example of why people are frustrated or angered by government.

ABC reporter, Rebecca Chase, began the story by explaining the predicament of Berrien County taxpayers.  An on-screen graphic labeled "Garbage Tax" appeared at the beginning of the story, and Chase began her report:

> In this south Georgia county of tobacco farms and pecan groves, taxpayers are angry that they are stuck with a three million dollar debt for this garbage recycling machine that they never approved and does not work.

(Emphasis added).

The story continued with Chase interviewing an upset taxpayer, and then describing the background of the controversy:

> In 1988, Berrien County had no place to put its garbage because the landfill was full.  So the county commission decided to buy this garbage machine with revenue bonds which do not require voter approval.

As Chase made this statement, television viewers saw a  corresponding video showing the Lundell machine in Berrien County.

-2-

Further in the story, viewers were shown another recycling machine sorting solid waste as Chase stated:

> The machine was supposed to work like this one in Tennessee, sorting and recycling up to ninety percent of the county's garbage and paying for itself by selling the recycled materials and charging user fees. That is how then-commissioner Joe Stallings promised it would work here. It did not.

Chase then interviewed the former Commissioner, Joe Stallings, who stated: "There's nothing physically wrong with the machine. It's the people."

Chase continued:

> Stallings blames people for not giving the machine a chance. But most people here blame him for misleading them about how much it cost to operate the plant. It was five times more expensive than he said it would be. The machine turned the garbage into fuel pellets and compost, but no one found a buyer. So the unsold material piled up outside -- nothing more than exposed trash. The state has now ordered the plant shut down as an environmental hazard.

The story then detailed citizen responses, including a class action lawsuit to void the taxpayers' obligation to pay for the recycling project. The story concluded by telling that Berrien County taxpayers now must have their garbage hauled to another county for disposal.

Lundell sued ABC, alleging that the statement that the recycling machine "does not work" falsely implied that the recycling machine was not mechanically operable.[1]  ABC concedes

---

[1]Lundell also alleged that two other statements in the story were defamatory:  the statement that "no one found a buyer" for **the** fuel pellets produced by the machine, and the statement that "taxpayers are now forced to have their trash hauled to another county's landfill."  The district court dismissed both of these claims, and Lundell does not raise these issues on appeal.

that the recycling machine was mechanically sound, and that the reason Berrien County no longer used the machine was because the county could not sell the by-products at a price sufficient to cover the machine's operating expenses. ABC defends the statement, arguing that the phrase "does not work" accurately implied that the Lundell machine and Berrien County's recycling plan did not work as intended or promised because the system did not work in a financially viable manner.

ABC filed a motion for summary judgment, arguing that Lundell could not demonstrate that the statement that the machine "did not work" was false, and that the challenged statement was not actionable because it was substantially true. The district court ruled that Lundell must bear the burden of proving that the challenged statement was false. See In re IBP Confidential Business Documents Litigation, 797 F.2d 632, 647 (8th Cir. 1986) (en banc), cert. denied, 479 U.S. 1088 (1987). The court recognized, however, that even if the statement was false, Lundell could not recover for defamation if the "gist" or "sting" of the report was substantially true. See Behr v. Meredith Corp., 414 N.W.2d 339, 342 (Iowa 1987). Nevertheless, the court denied ABC's motion, holding that a disputed question of fact existed as to the "sting" of the report and, therefore, the jury must decide the question. At the close of Lundell's evidence, the court directed a verdict for ABC on Lundell's claim of actual malice. The court concluded that Lundell was a "private figure plaintiff" and, therefore, must show by a preponderance of the evidence that ABC breached the standard of care of reasonably prudent professional broadcast news employees in broadcasting the report. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974); Jones v. Palmer Communications, Inc., 440 N.W.2d 884, 898 (1989).

Following an eight-day trial, the jury returned a verdict for Lundell assessing $900,000 in damages for injury to reputation and $158,000 in damages for lost profits.  Later, the court granted ABC's renewed motion for judgment as a matter of law, ruling that the news report was substantially true as a matter of law.  The court also ruled that if it had not entered judgment as a matter of law, it would have set aside the $158,000 lost profits award because of insufficient evidence.  Lundell appeals.

## I.

A critical dispute in this case is over our standard of review. Lundell argues that there is substantial evidence that ABC's statement that the machine did not work is false, and, therefore, the court could not decide that the report was substantially true as a matter of law, and neither the district court nor this court can disturb the jury's finding.

Lundell argues that we are guided by our usual standard for reviewing a district court's decision to enter judgment as a matter of law.  Under that standard, we ask whether there is sufficient evidence to support a jury verdict.  White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992) (standard for granting a motion for judgment as a matter of law).  We analyze the evidence in the light most favorable to Lundell, and we do not weigh or evaluate the evidence or consider questions of credibility.  Id.  To sustain a motion for judgment as a matter of law, all the evidence must point one way and be susceptible of no reasonable inference sustaining Lundell's position.  Id.

ABC, on the other hand, contends that we are not restrained in this First Amendment case by the deference ordinarily accorded jury findings. Citing New York Times Co. v. Sullivan, 376 U.S. 254 (1964), ABC argues that we must "make an independent examination of the whole record," unrestrained by the deference ordinarily

afforded to the jury, in order to ensure that no "forbidden intrusion on the field of free expression" has occurred. Id. at 285 (internal quotation and citation omitted).

To remove the chilling effect of defamation laws and to encourage "uninhibited, robust, and wide-open" debate, the Supreme Court created a constitutional rule protecting the good faith criticism of government officials in New York Times. 376 U.S. at 270-71. Because freedoms of expression require "breathing space," id. at 272, the Court held that the Constitution "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice.'" Id. at 279-80. Actual malice is a statement made "with knowledge that it was false or with reckless disregard of whether it was false." Id. at 280. To ensure no forbidden intrusion on these First Amendment liberties, an appellate court's review of a trial court's finding of actual malice is not controlled by the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a). Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 498-511 (1984). "Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of `actual malice.'" Id. at 511.

The Supreme Court examined the protection for media defendants in suits brought by private individuals in Gertz, 418 U.S. 323. The Court determined that the New York Times' actual malice standard was inappropriate in suits brought by private persons attempting to prove injury to their reputation on a matter of public interest. Id. at 344-47. The Court nevertheless imposed two other constitutional limitations. First, the Court held that the states could not impose liability without fault. Id. at 346-47. Thus, a private figure cannot recover against a media

defendant without showing that the statement at issue was false and the media defendant was at fault in publishing the statement. Id. at 347. Second, the Court held that the states could not permit recovery of presumed or punitive damages without a showing of actual malice. Id. at 349-50.

ABC argues that Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986), made the finding of falsity a constitutional rule requiring us to independently review the record to determine whether there has been any "forbidden intrusion on the field of free expression." New York Times, 376 U.S. at 285.

In Philadelphia Newspapers, a series of newspaper articles linked the plaintiffs to organized crime. The Court decided that the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern. 475 U.S. at 777. After examining the case law concerning the constitutional limits on defamation suits, the Court explained:

> When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, as in Gertz, the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in Dun & Bradstreet, the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape.

Id. at 775 (emphasis added).

The Court emphasized that "the common-law presumption that

-7-

defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." Id. at 777.

From this language in Philadelphia Newspapers, ABC argues that the findings of falsity and substantial truth are subject to constitutional rules requiring this court to independently evaluate the findings in a suit brought by a private figure against a media defendant. ABC contends that we cannot focus on the literal truth or falsity of the statement, but rather we must decide whether the challenged statement meets the constitutional requirements of a false statement. "Minor inaccuracies do not amount to falsity so long as `the substance, the gist, the sting, of the libelous charge be justified.'" Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991) (quoting Heuer v. Kee, 59 P.2d 1063, 1064 (Cal. Dist. Ct. App. 1936)). A statement is not false unless "it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Id. (internal quotation omitted).

Lundell responds that the independent review mandated in New York Times only applies to a lower court finding of actual malice, and not to findings of falsity or substantial truth. Lundell argues that the issues of falsity and substantial truth are simply not controlled by the "constitutional rule" set forth in New York Times. Lundell points out that the court correctly instructed the jury on the false statement requirement and ABC's defense of substantial truth, and we cannot overturn the findings of the jury.

There is no question that the independent review required by New York Times applies to a trial court finding of actual malice. 376 U.S. at 284-86. Accord Bose Corp., 466 U.S. at 514 ("We hold that the clearly-erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a

case governed by New York Times Co. v. Sullivan."). Here, however, we are not reviewing a finding of actual malice. The district court categorized Lundell as a private figure plaintiff. Thus, the issue boils down to whether findings of falsity or substantial truth are constitutional rules requiring us to independently evaluate the record.

When the Court in Philadelphia Newspapers discussed overriding the common law because of First Amendment protections, it focused on the allocation of the burden of proof. See 475 U.S. at 777. The Pennsylvania Supreme Court, reversing the trial court, held that a Pennsylvania statute placed the burden of proving truth on the publisher, and that this did not violate the Federal Constitution. Id. at 770-71. The Supreme Court reversed, holding that the common-law presumption that defamatory speech is false is unconstitutional when a plaintiff seeks damages against a media defendant for speech of public concern. Id. at 777. The Court identified the burden of proof, not the element of falsity, as the constitutional requirement. To decide the case, the Court only held that the Constitution placed the burden of proving falsity on the plaintiff. Indeed, the Court emphasized that it did not consider what quantity of proof of falsity that a private figure plaintiff must present to recover. Id. at 779 n.4; Accord Bose Corp., 466 U.S. at 514 n.31 (commenting that there might be many other questions of fact in a defamation case that are irrelevant to the constitutional standard of New York Times Co. v. Sullivan, and to which a "clearly erroneous" standard of appellate review applies).

In Masson, the Supreme Court addressed whether a writer's alteration of quotations attributed to the subject of an interview could establish the actual malice required for a defamation suit by a public figure. 501 U.S. at 499. The Supreme Court's analysis of actual malice required it to consider the concept of falsity. Id. at 513. The Court examined six different published passages to

-9-

determine whether the published passages were materially different from the tape-recorded statements, thereby creating an issue of fact for the jury as to falsity. Id. at 522-25. The Court concluded that one of the passages did not materially alter the meaning of the tape-recorded statement and therefore, was not actionable. Id. at 524. With respect to the other five passages, however, the Court decided that a reasonable jury could find a material difference between the meaning of the published passages and that of the tape-recorded statements. Id. at 522-25. Because a jury could find the differences in the statements exposed the interviewee to contempt, ridicule, or obloquy, the Court held that it could not decide the issue of falsity as a matter of law. Id. Masson makes abundantly clear that in reviewing a summary judgment ruling, which involves a similar standard as a review of a directed verdict ruling, we examine the evidence in the light most favorable to the plaintiff and decide if there is sufficient evidence to support a jury finding of falsity. Id. at 520-21.[1]

Recently, we reviewed the district court's grant of summary judgment to a defendant television station on a defamation claim. Toney v. WCCO Television, Midwest Cable & Satellite, Inc., 85 F.3d 383 (8th Cir. 1996). We reversed the district court's grant of summary judgment as to one of the seven statements alleged to be defamatory. Id. at 389. The district court ruled that the statement was not actionable because even if the statement was defamatory, it was true. Id. at 386. In an opinion written by Justice White, we agreed with the district court's conclusion that one of the statements "could be defamatory," and, therefore, the issue was one for a jury to decide. Id. at 388. We disagreed,

_____

[1] "On summary judgment, we must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." Masson, 501 U.S. at 520 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). We examine the evidence in a light most favorable to the nonmoving party, to see if there is sufficient evidence to support a jury finding. Anderson, 477 U.S. at 255.

however, with the district court's conclusion that the statement was "so plainly true that it could be so characterized as a matter of law." Id. We directed that this question should be decided by a jury. Id. at 389.

This is not a situation where the underlying facts as to the gist or sting of the defamatory charge are undisputed so that the trial court may determine substantial truth as a matter of law. Compare Campbell v. Quad City Times, Inc., 547 N.W.2d 608, 610 (Iowa Ct. App. 1996), with Jones, 440 N.W.2d at 891. As the Third Circuit held in Schiavone Construction Co. v. Time, Inc., "a jury must resolve the question of the sting because reasonable persons could differ on that question." 847 F.2d 1069, 1084 (3d Cir. 1988).

There are other issues in defamation actions which courts have reserved for the jury to decide. For example, in Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990), the Supreme Court rejected the argument that opinions are absolutely protected by the First Amendment, id. at 18-19, recognizing that "expressions of `opinion' may often imply an assertion of objective fact," id. at 18. The Court allowed the defamation action to go forward, ruling that a reasonable trier of fact could find that the so-called opinion could be interpreted as a false assertion of fact. Id. at 21. Had the Court believed it must independently decide whether a statement constituted a false statement of fact, the Court would not have used this inquiry. Accord Partington v. Bugliosi, 56 F.3d 1147, 1153 (9th Cir. 1995) (standard for summary judgment is whether a reasonable factfinder could conclude that the statements imply a false assertion of objective fact).

Philadelphia Newspapers, Masson, and, in a sense, Milkovich, all point to our determination that the First Amendment commands in a defamation case brought by a private plaintiff against a media defendant only that we review the record to determine whether a

-11-

reasonable trier of fact could find that the statement could be interpreted as a false assertion of fact. In essence, these cases support a sufficiency of the evidence analysis.

We are further supported in this conclusion by <u>Harte-Hanks, Inc. v. Connaughton</u>, 491 U.S. 657 (1989), where the Supreme Court, in reviewing an actual malice determination, stated that the clearly erroneous standard could be applied to the credibility determinations, but the reviewing court must determine whether the statements are the character which the First Amendment protects. <u>Id.</u> at 686-88. On review of the record, it agreed with the Court of Appeals that the evidence supported a finding of actual malice. <u>Id.</u> at 689.

Within the context of deciding whether there is substantial evidence to support the jury's finding of falsity, we must also discern whether there has been any intrusion on the protections of the First Amendment. Thus, if no reasonable jury could conclude that the statement was a false statement of material fact, the libel defendant is protected from a defamation suit. <u>See</u>, <u>e.g.</u>, <u>Haynes v. Alfred A. Knopf, Inc.</u>, 8 F.3d 1222, 1228 (7th Cir. 1993) ("The rule making substantial truth a complete defense and the constitutional limitations on defamation suits coincide."); <u>Campbell</u>, 547 N.W.2d at 610. The question of whether there has been any intrusion on First Amendment principles is seemingly subsumed in the inquiry as to whether there is substantial evidence to support the jury's findings as to falsity and substantial truth. <u>See</u>, <u>e.g.</u>, <u>Norse v. Henry Holt & Co.</u>, 991 F.2d 563, 567 (9th Cir. 1993) (summary judgment for author appropriate when no reasonable jury could understand the statement, when read in context, to be defamatory); <u>Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655</u>, 39 F.3d 191, 195-96 (8th Cir. 1994) (summary judgment for union appropriate when its statements could not reasonably be read to be false assertions of fact).

Regardless of our standard of review, ABC contends that the district court correctly granted judgment to it because Lundell did not prove the falsity of the statement.  Alternatively, ABC argues that it is entitled to judgment as a matter of law because Lundell is a public figure for purposes of this action, and did not prove actual malice as defined in New York Times.

**A.**

In this diversity case, we review the district court's interpretation of Iowa law de novo, and give no deference to the district court's interpretation of state law.  Salve Regina College v. Russell, 499 U.S. 225 (1991).  Of course, Iowa courts must apply the governing federal constitutional standards in this defamation case.  Toney, 85 F.3d at 386.

In Iowa, libel "is the malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose the person to public hatred, contempt, or ridicule or to injure the person in the maintenance of the person's business."  Vinson v. Linn-Mar Community Sch. Dist., 360 N.W.2d 108, 115 (Iowa 1984) (internal citation and quotation omitted).  Under Iowa law, whether a statement is defamatory "must be determined by giving to the subject-matter thereof, as a whole, that meaning which naturally belongs to the language used."  Kiner v. Reliance Ins. Co., 463 N.W.2d 9, 14 (Iowa 1990).  Iowa recognizes substantial truth as an absolute defense in a defamation action.  Palmer Communications, 440 N.W.2d at 891.  "The libel defendant need not establish the literal truth of every detail of the broadcast so long as the `gist' or `sting' of the broadcast in question is substantially true."  Id.  The "gist" or "sting" is determined by "looking at the highlight of the broadcast, the pertinent angle of it, and not to

the items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." Id. (quoting Behr, 414 N.W.2d at 342).

ABC argues that the phrase "does not work" used as part of the description of events in Berrien County constitutes the use of language in accord with one of its accepted meanings, and, therefore, the phrase is not materially false. ABC expands on its argument by characterizing the phrase "does not work," as including more than Lundell's interpretation that the machine was mechanically inoperable. ABC explains that a publication is substantially true when the allegedly false statement involves the use of language consistent with an accepted meaning. Because the machine failed to function on a financially self-sufficient basis, failed to solve the county's waste disposal crisis, and had not operated since its permit had been suspended, ABC contends the phrase is substantially true.

In Bose Corporation, a manufacturer sued Consumer Reports based on statements disparaging a new type of Bose speakers. 466 U.S. at 487-88. The Court concluded that the statement was not an assessment of events that speak for themselves, but "one of a number of possible rational interpretations of an event that bristled with ambiguities and descriptive challenges for the writer." Id. at 512 (internal quotation omitted). The Court did not allow recovery for choice of language which, though perhaps reflecting a misconception, represented "the sort of inaccuracy that is commonplace in the forum of robust debate to which the New York Times rule applies." Id. at 513. Similarly, in Janklow v. Newsweek, Inc., 788 F.2d 1300 (8th Cir.) (en banc), cert. denied, 479 U.S. 883 (1986), we stated that we "will not make editorial judgments about specific word choice in order to portray a plaintiff in the best possible light, particularly when the `sting' of the implication . . . is still present when the full chronology is laid out." Id. at 1306.

Contrary to ABC's interpretation, the statement did not identify the system as not working, but the machine itself. The statement was specific: "[T]his garbage recycling machine . . . does not work." See Kiner, 463 N.W.2d at 14. The court used the exact words of the broadcast in submitting the question of falsity to the jury. The jury returned a general verdict in Lundell's favor, requiring it to find that the statement was false. The sting of the broadcast is the heart of the matter in question -- the hurtfulness of the utterance. Jones, 440 N.W.2d at 891 (quoting Behr, 414 N.W.2d at 342). If the underlying facts as to the gist or sting are undisputed, substantial truth may be determined as a matter of law. Jones, 440 N.W.2d at 891; Behr, 414 N.W.2d at 342. Here, however, it is evident that the underlying facts as to the gist of the statement are the subject of a reasonable dispute, whether the statement goes to the operability of the machine, or its economic shortcoming. When the language used is capable of two meanings, including the one ascribed by a complainant, it is for the jury to decide the meaning conveyed. Vinson, 360 N.W.2d at 116. ABC's position that the statement "does not work" meant only that the machine did not operate in a financially viable manner is not expressly included in the story itself. Although Stallings said the machine worked and Chase later discussed the financial aspect of the machine, the story, as a whole, never clarified the original statement that the machine "does not work." The statement is not nearly as ambiguous as the statements in Bose Corporation or Janklow. The phrase "does not work" is specific and is not the sort of inaccuracy that is "commonplace in the forum of robust debate." Masson, 501 U.S. at 514 (quoting Bose Corp., 466 U.S. at 513). We, therefore, cannot conclude that the story, as a whole, was substantially true as a matter of law.

There is substantial evidence from which a reasonable jury could conclude that the statement was false, and from which a reasonable jury could conclude that the sting of the story was that

-15-

the Lundell machine was mechanically inoperable.  After carefully examining the videotape, we are satisfied that a reasonable jury could conclude from the plain meaning of the words used, that the statement that the machine "does not work" meant that the machine was inoperable.  Even according ABC the independent review it requests, we are confident that there has been no forbidden intrusion on First Amendment principles.

This conclusion is reinforced by other evidence in the record.  There is evidence that the very genesis of ABC's report was based on the false premise that the machine was broken.  Chase initiated the story after reading an article in the <u>Atlanta Journal- Constitution</u> concerning the Berrien County facility and local government revenue bond financing.  The article stated that the facility had financial problems, but it did not state that the Lundell machine did not work.  Nevertheless, Chase prepared a proposal for a news story about the situation in Berrien County, and her proposal included the statement that the recycling machine "has never worked."  Chase acknowledged at trial that she had not interviewed anyone with knowledge of the Berrien County facility before making her story proposal, and that she had no knowledge of who, if anyone, her producer, Elissa Weldon, had interviewed.  Chase also admitted that at the time of the broadcast she believed that the machine had a broken main shredder, and this was one reason why she reported that the machine did not work.  David Gaskins, the former plant manager for the Berrien County Resource Recovery facility, testified that the entire system, including the main shredder, was operable at the time ABC prepared its report.  Others corroborated this testimony.

Before airing the story, Chase contacted Vernon Lundell.  Lundell told Chase that the Lundell system in Berrien County worked, that opposition to the system was political, and that he had stayed out of the political dispute in Berrien County.  A few days before the broadcast, Gary Lamberson, an independent sales

-16-

representative for Lundell, contacted Chase and advised her that any story on the Berrien County facility based on information provided only by local political opponents would not tell the true story of the facility. Lamberson urged Chase to interview the former plant managers to learn the true facts about operation of the system. Lamberson testified that Chase left him with the impression that she was "too busy" to conduct further interviews and that the story was "a done deal."

ABC contacted Gaskins to arrange filming of the recycling system. Gaskins was not interviewed by Chase or Weldon prior to the broadcast. No one from ABC ever asked Gaskins if the Lundell system was capable of processing garbage. When the ABC camera crew came to the recycling plant, one of the crew members remarked to Gaskins that he understood that the plant was broken down. Gaskins responded that all he needed was some garbage to process and "I'll fire it up." After ABC broadcast the story, Lundell contacted ABC seeking a retraction. ABC responded with a letter stating:

> Contrary to your letter, the report does not state that the "system" does not work. What the report does say is that the garbage recycling machine purchased by Berrien County does not work. This is in fact completely true. At the time of our broadcast the Berrien County machine was not functioning. As I am sure you are aware, the main shredder broke down and has not been repaired. Indeed the Georgia Department of Natural Resources has acted to close the facility down.

This evidence amply demonstrates that ABC actually believed that its broadcast stated that the machine was mechanically inoperable, and ABC does not dispute that the machine was mechanically sound. Accordingly, there is substantial evidence from which a reasonable jury could find that the sting of ABC's broadcast was false.

Finally, ABC contends that other parts of the story negate any

-17-

false implication derived from the statement that the machine was mechanically inoperable:  (1) the report included footage showing the machine operating; (2) the report noted that the machine did turn garbage into fuel pellets and compost and showed fuel pellets made by the machine; (3) the report included the express statement that "there's nothing physically wrong with the machine.  It's the people"; and (4) the report showed footage of another Lundell machine operated by Tennessee officials.

These other parts of the story do not change our conclusion.[2]  The report did not actually show the machine operating, but only included footage showing a worker sorting garbage and fuel pellets made by the machine.  The conclusion drawn from the footage of the Tennessee machine is also inconsistent with ABC's argument.  Along with the footage showing the Tennessee machine, Chase states:

> The machine was supposed to work like this one in Tennessee, sorting and recycling up to ninety percent of the county's garbage and paying for itself by selling the recycled materials and charging user fees.  That is how then-commissioner Joe Stallings promised it would work here.  It did not.

A reasonable jury could easily conclude from Chase's comparison of the Berrien County machine with the Tennessee machine that the Tennessee machine worked, and the Berrien County machine did not.  Cf. Treutler v. Meredith Corp., 455 F.2d 255, 258 (8th  Cir. 1972).  Although Stallings stated that there was nothing physically wrong with the machine, a reasonable juror could discredit the statement, as the story painted Stallings as someone who had misrepresented the machine to the Berrien County taxpayers.

---

[2]ABC also argues that the district court correctly granted it judgment as a matter of law because Lundell failed to sustain its burden of proving:  (1) that the broadcast was "of and concerning" Lundell; and (2) that ABC violated the standard of care practiced by professional journalists.  We have carefully considered these arguments and conclude there is substantial evidence to support the jury's findings.

For these reasons, we conclude there is a disputed question of fact as to the sting of the story, and substantial evidence to support the jury's finding of a false statement, making the district court's entry of judgment for ABC erroneous.  We reverse the district court's entry of judgment for ABC as a matter of law.

**B.**

ABC argues in the alternative that the district court's ruling may be upheld because Lundell is a public figure for the purpose of this action, and did not prove actual malice as defined in New York Times.

The determination of a plaintiff's status as a private or public figure is an issue of law.  Bagley, 797 F.2d at 644; Jones, 440 N.W.2d at 894 (determination of plaintiff's status is a question of law governed by federal constitutional law).

In Gertz, the Court identified two categories of public figures to whom the New York Times standard applies:

> The first category is "general purpose" public figures, those who have attained a position "of such persuasive power and influence," and of "such pervasive fame or notoriety," that he or she may be considered "a public figure for all purposes and in all contexts."  The second, more common, type of public figure is the "limited purpose" public figure.  The court defined this type as a person who voluntarily injects himself or are drawn into a particular public controversy, and thereby becomes a public figure for a limited range of issues.

418 U.S. at 351.  The Court also noted that "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare."  Id. at 345.   In determining whether an individual should be considered a limited public figure, we must focus our attention on the "nature

-19-

and extent of an individual's participation in the particular controversy giving rise to the defamation." Gertz, 418 U.S. at 352. By so doing, we then can determine whether the individual has voluntarily and purposefully injected himself into that controversy in an attempt to influence the resolution of the controversy. Id. at 345.

Applying these factors, we must first identify the particular public controversy giving rise to the defamatory speech. Bagley, 797 F.2d at 645. Here, the particular controversy giving rise to ABC's report was the garbage disposal problem in Berrien County. This controversy is clearly a public controversy involving questions of "public concern." See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761-62 (1985) (plurality opinion); Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296-97 (D.C. Cir.) (defining a public controversy as one raising issues that might reasonably be expected to have an impact beyond the parties directly enmeshed in the particular controversy), cert. denied, 449 U.S. 898 (1980); Johnson v. Nickerson, 542 N.W.2d 506, 511 (Iowa 1996) (same).

After identifying the particular controversy giving rise to the defamation, we then examine the "nature and extent" of Lundell's involvement. Bagley, 797 F.2d at 645. This inquiry is necessary to determine whether Lundell has "thrust [itself] to the forefront of [this] particular public controvers[y] in order to influence the resolution of the issues involved." Gertz, 418 U.S. at 345.

The Supreme Court faced a situation very similar to this case in Hutchinson v. Proxmire, 443 U.S. 111 (1979). Hutchinson did research with primates and received research grants from three federal agencies. Id. at 115. Senator William Proxmire began a public campaign to expose wasteful government spending by giving a "Golden Fleece" award to federal agencies who funded what Proxmire

-20-

considered to be wasteful projects. Id. at 114. After denying protection under the Speech and Debate Clause, id. at 123-33, the Court reversed lower court rulings that Hutchinson was a public figure, id. at 133-36. The Court observed that Hutchinson's activities and public profile were like many members of his profession, and that his public writings reached a relatively small category of professionals concerned with research in human behavior. Id. at 135. "To the extent the subject of his published writings became a matter of controversy, it was a consequence of the Golden Fleece Award." Id. The Court emphasized that, "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." Id. The Court also reasoned that Hutchinson did not "thrust himself or his views into public controversy to influence others," and at most, the public controversy consisted of concerns about general public expenditures. Id. The Court rejected the arguments that Hutchinson's applications for and receipt of federal grants and publications in professional journals elevated him to public figure status. Id. The Court's determination was also influenced by the fact that Hutchinson's only access to the media was limited to responding to the announcement of the Golden Fleece award, and that Hutchinson did not have regular and continuing access to the media, one of the accouterments of being a public figure. Id. at 136.

The Supreme Court also reversed lower court rulings that a plaintiff was a limited purpose public figure in Wolston v. Reader's Digest Ass'n, 443 U.S. 157 (1979). There, publishers of a book described Wolston as being a Soviet agent. Id. at 159. Sixteen years before the book's publication, Wolston had received newspaper coverage because he had failed to comply with a grand jury subpoena and had been subject to contempt proceedings. Id. at 162-63. Although Wolston's decision not to appear before a grand jury was likely to attract media attention, the Court concluded that this was not the type of activity that established public figure status. Id. at 167. Wolston did not discuss the matter

with the press, and limited his involvement to defending the contempt charges.  Furthermore, Wolston did not fail to appear in order to influence the public with respect to any controversy, and did not voluntarily thrust or inject himself into the controversy concerning Soviet espionage.  Id. at 168.  The Court said:  "It would be more accurate to say that [Wolston] was dragged unwillingly into the controversy."  Id. at 166.  "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."  Id. at 167.  "A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of New York Times."  Id. at 167-168.

Lundell's status mirrors that of Hutchinson.  Lundell did not inject itself into the Berrien County controversy.  See Bagley, 797 F.2d at 645-46.  Cf. National Found. for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc., 705 F.2d 98, 101-02 (4th Cir.), cert. denied, 464 U.S. 830 (1983).  Indeed, Chase admitted that she "did not uncover any evidence from any source that [Lundell] had attempted to inject [itself] into [the] political debate of Berrien County."  Although Lundell contracted with the county for the sale of the machine, the Supreme Court makes clear in Hutchinson and Wolston that it is the plaintiff's role in the controversy, not the controversy itself, that is determinative of public figure status.  See Hutchinson, 443 U.S. at 135; Wolston, 443 U.S. at 167.  Even though the garbage disposal problem was a matter of public concern, we focus on Lundell's role in the controversy, not the public nature of the controversy itself.  ABC does not direct us to any evidence that Lundell placed itself into the controversy to influence the issues involved.  See Gertz, 418 U.S. at 351-52 (plaintiff not a limited purpose public figure even though he represented a client on a matter related to the controversy at issue).  Furthermore, ABC cannot, by its own conduct, create its own defense by making Lundell a public figure.  Like the circumstances in Hutchinson, there is no evidence that

Lundell had access to the media to refute the ABC report. 443 U.S. at 136. Indeed, ABC denied Lundell's request for a retraction of the story. For these reasons, we reject ABC's alternative argument.

**III.**

ABC attacks the award of damages on several grounds. First, ABC contends that Lundell cannot recover separate damages for reputational harm and lost profits. Second, ABC contends Lundell failed to prove actual damages and lost profits. The district court instructed the jury to consider three different types of loss: damage to reputation, past lost profits, and future lost profits. The jury awarded no damages for future lost profits, $158,000 for past lost profits, and $900,000 for damage to reputation.

**A.**

Citing <u>Martin Marietta Corp. v. Evening Star Newspaper Co.</u>, 417 F. Supp. 947 (D.D.C. 1976), ABC argues that a corporation cannot recover for both lost profits and injury to reputation.

> The law of libel has long reflected the distinction between corporate and human plaintiffs by limiting corporate recovery to actual damages in the form of lost profits . . . "Although a corporation may maintain an action for libel, <u>it has no personal reputation</u> and may be libeled only by imputation about its financial soundness or business ethics."

<u>Id.</u> at 955 (quoting <u>Golden Palace, Inc. v. National Broadcasting Co.</u>, 386 F. Supp. 107 (D.D.C. 1974)).

ABC sets forth a policy argument that we should adopt the reasoning of the district courts of the District of Columbia. The Iowa courts, however, appear to uniformly allow business entities

to recover damages for injury to their reputation as well as lost profits. See, e.g., Vojak v. Jensen, 161 N.W.2d 100, 106, 110-11 (Iowa 1968); G & H Soybean Oil, Inc. v. Diamond Crystal Specialty Foods, Inc., 796 F. Supp. 1214, 1217 (S.D. Iowa 1992) (applying Iowa law).  We therefore reject ABC's argument.

We also reject ABC's argument that there is insufficient proof of actual damages.  Vernon Lundell testified that Lundell began operating in 1945 and had always had an excellent reputation in the industry and in Iowa.  Another witness testified that just before the broadcast, Lundell was the industry leader for this type of equipment.  Several witnesses testified that after the broadcast, interest in the machine vanished.  It is undisputed that Lundell never sold another machine following the broadcast.  This evidence is more than sufficient to sustain the jury's finding that Lundell was damaged by the story.  There is also competent evidence to support the jury's monetary award.  See Gertz, 418 U.S. at 350. The historical sales data, as well as evidence that Lundell spent $2 million dollars in the development of the recycling system, constitutes competent evidence of the dollar value of the injury.[3]  See id.

**B.**

ABC contends that even if we reverse the district court's entry of judgment, we must affirm the court's alternative ruling that Lundell failed to prove lost profits resulting from the broadcast.  ABC contends that in order to recover lost profits, Lundell must identify the sales it lost because of the report.

Lundell contends that the district court can only reverse the jury verdict if the verdict is against the great weight of the

---

[3]For these reasons, we also reject ABC's contention that the award is excessive.

evidence.  See White, 961 F.2d at 780.  Lundell confuses the standard for reviewing a ruling on a motion for a new trial on the ground that the verdict is against the weight of the evidence with the standard for reviewing a ruling on a motion for judgment as a matter of law.  Id. at 779-80.  Here, the district court entered judgment as a matter of law because there was a lack of evidence of lost profits.  Accordingly, our standard of review is whether there is sufficient evidence to support the verdict, not whether the verdict is against the great weight of the evidence.  See id.

The level of proof required to establish the exact amount of lost profits is not as high as the level of proof required to establish that some loss occurred.  Orkin Exterminating Co. v. Burnett, 160 N.W.2d 427, 430 (Iowa 1968).  As the Iowa Supreme Court explained:

> Courts have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages.  If it is speculative and uncertain whether damages have been sustained, recovery is denied.  If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated.

Id.

The Iowa Supreme Court has rejected the argument that a plaintiff must identify specific lost sales to recover lost profits damages.  Page County Appliance Ctr., Inc. v. Honeywell, Inc., 347 N.W.2d 171, 178 (Iowa 1984).  Decreased income after the defendant's damaging conduct is sufficient to support an award for lost profits so long as the record discloses a reasonable basis from which the amount can be inferred or approximated.  Id.  "Simply because the loss of profits cannot be shown with precision, defendant who caused the damages, may not be heard to say that no damages may be awarded."  Orkin, 160 N.W.2d at 430 (quoting Exercycle of Mich. Inc. v. Wayson, 341 F.2d 335, 337 (7th Cir.

-25-

1965)).

The district court set aside the lost profits award for two reasons. First, it concluded that there were "tremendous problems" with the machines sold by Lundell, and that Lundell had to take back most machines it sold through litigation or otherwise. Second, the court concluded that Lundell's evidence concerning lost sales was inconsistent. Vernon Lundell testified that Lundell would have sold over twenty systems in the two years following the story. Vernon Lundell's son-in-law and vice-president of the company, Steve Paulsen, testified that he thought the company could have only sold four systems.

Although Lundell's and Paulsen's testimony is inconsistent, it does not cause us to conclude that there was no reasonable basis for calculating lost profit damages. The jury was free to accept or reject the opinion of either one of these witnesses. The discrepancy between the two witnesses does not make the damage amounts lacking in a reasonable basis, but only demonstrates the opinions of different witnesses. Further, there was other evidence to support the lost profits award. First, there was evidence that before the report there was substantial interest in the Lundell machine, and following the report, Lundell could not sell a single machine. There was evidence that in the years before the report, Lundell sold an average of two recycling systems per year, and that each machine had a gross profit of approximately $240,000. The historical sales figures for the years preceding the story also provide a reasonable basis for approximating lost profits damages. Indeed, Lundell earned $158,000 in 1987 on sales of over $1.5 million, representing the sale of one machine.

Furthermore, the issue of whether the machines had "tremendous problems" was conflicting. Lundell presented extensive evidence that the defamatory statements in the ABC report killed interest and sales of the Lundell machine. ABC refuted this theory,

presenting evidence that the loss of sales was caused by intrinsic problems with the machine.  There was evidence supporting both theories, and it was an issue for the jury, not the court, to resolve.

Thus, we conclude that a reasonable basis existed to support an award of lost profits.  We reverse the district court's alternative ruling setting aside the lost profits award.

We reverse the district court's entry of judgment for ABC.  We remand to the district court with directions that the court reinstate the jury verdict for Lundell and award of damages for Lundell, including damages for lost profits.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.