# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-4390/98-1021
_____

Porous Media Corporation,        \*
                                \*
      Appellant/Cross-Appellee,    \*
                                \* Appeals from the United States
  v.                           \* District Court for the
                                \* District of Minnesota.
Pall Corporation,               \*
                                \*
      Appellee/Cross-Appellant.    \*
                                \*

_____

Submitted: October 21, 1998
Filed:  April 9, 1999
_____

Before McMILLIAN, JOHN R. GIBSON, and HANSEN, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

Porous Media Corporation and Pall Corporation, competing manufacturers of filters used in medical and other industries, appeal from a $1.6 million Lanham Act[1] judgment in favor of Porous, entered by the district court[2] pursuant to a jury verdict.

_____

[1]Section 43(a) of the Lanham Act is codified at 15 U.S.C. § 1125(a) (1994).

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Both parties also appeal several related orders of the district court. These include the court's granting of Pall's motion to set aside a $120,000 libel verdict for Porous; the court's entry of judgment for Porous in regard to Pall's false advertising counterclaim under the Lanham Act--a counterclaim rejected by the jury; the court's repeated refusals to allow Porous to add a punitive damages claim to its complaint; and the court's refusal to award Porous attorneys' fees and costs under the Minnesota Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43-.48 (1996). We affirm the judgment of the district court.

## I.

Viewed in the light most favorable to the jury's verdict, the facts underlying the parties' dispute are as follows. Porous and Pall produce competing disposable box filters: respectively, the DBF23 and the BB50T. Both products perform suitably as intake filters for oxygen concentrators and ventilators, but only Pall's BB50T is sufficiently "hydrophobic" (water-repellant) to be suitable for use in the expiratory side of ventilators, with laser surgery equipment, or with other "wet" medical applications. Porous's filter, meanwhile, is cheaper than its more hydrophobic counterpart and performs at least as well as the BB50T when tested in "dry" applications.[3] Use of non-hydrophobic filters in "wet" medical applications, however, presents grave health risks. For example, moisture contained in a patient's breath could potentially clog the outgoing or "wet" side of a ventilator, preventing the patient from exhaling. Because of these and other risks, the FDA regulates the ventilator filter industry. Porous's filter is FDA-approved only for the inspiratory, or "dry" side of ventilators, where hydrophobicity is not required.

Pall had already developed, patented, and successfully marketed its BB50T

---

[3]The record indicates that Pall's filter sold for approximately $3.00 per unit, while Porous's sold for approximately $2.00.

filter when Porous--carefully avoiding patent infringement--developed the DBF23, acquired a separate patent, and sought a "niche" market for intake filters used with oxygen concentrators. In oxygen concentrators, intake filters remove dust and other contaminants from the air before the air enters the concentrator's compressor. Because oxygen concentration is a "dry" application, intake filters need not be hydrophobic, and FDA regulation is absent.

Porous hoped to dominate its "niche" market, then to springboard into the larger medical-filter market by establishing a good business reputation and earning referral sales. Pall, meanwhile, viewed the DBF23's entry into the marketplace with unease. Determined to "stop the insurgency" of Porous into the Pall-dominated market, Pall tested the two filters in order to find a relevant quality difference between them. At first, Pall's tests found no such difference, for Porous's filter performed as well as or better than Pall's in ambient (i.e. dry room air) conditions. Discouraged with these results and still fearful of losing customers to Porous, Pall ordered further tests to be undertaken in "wet" conditions. Pall did so even though hydrophobicity is wholly irrelevant in oxygen-concentrator applications; its own internal communications documented the company's awareness of this irrelevance. Further, Pall's "wet" condition tests were irregular by industry standards. Although most "wet" applications present dangers associated with water vapor, Pall conducted its tests in a water-saturated environment by soaking the two filters. Pall's further tests indeed differentiated the BB50T from the less expensive DBF23, but not in a manner relevant to Porous's customers.

In order to thwart Porous's newfound success, Pall's national sales manager, Steve Swalgen, sent the following "ALERT" to some of Porous's largest customers:

<u>ALERT</u>

Please be advised that a filter has been introduced to the marketplace that in <u>appearance</u> seems to be a "clone" of the Pall

-3-

Breathing Circuit Filter (BB-50T).

Be advised that the similarity <u>ends</u> with appearance. The attached [set of reports] notes a serious <u>hydrophobic deficiency</u> as to the competitive product. The "clone" device is offered by a company called Porous Media. If your particular application for the Pall BB-50T operates in <u>any</u> moist, wet, high-humidity (condensation) environment, then you will run into "product occurrence" situations routinely should you utilize the Porous Media device instead of the Pall BB-50T. I urge you or your engineering staff to consider the enclosed, and conduct your own tests for verification if necessary.

Please contact me with any questions or comments.

(emphases in original).

Porous objected to numerous representations made in the ALERT. These included (i) labeling Porous's filter a "clone" of Pall's; (ii) the claim that Porous's filter would fail in <u>any</u> "moist, wet, high-humidity (condensation) environment," when Pall had only tested the filter by immersing it in water; (iii) the statement that the similarity between the two filters <u>ends</u> with appearance, when Pall's own tests demonstrated similar performance in a "dry" environment; and particularly (iv) the very notion that Porous's filter had a "serious hydrophobic deficiency," in light of Pall's knowledge that hydrophobicity is neither needed nor desired in oxygen-concentrator filters or other "dry" applications.

Although the ALERT was sent to only five companies, information from the ALERT circulated more widely than the ALERT itself, largely through Pall's own efforts.[4] First, the ALERT reached Porous's customers in the oxygen-concentrator "original equipment manufacturer" market: a "niche" market with a small number of high-volume participants. In that market, three companies produce seventy percent

_____

[4]For example, Pall's marketing personnel sent data and other information derived from the ALERT to other companies and repeatedly brought up the issue of hydrophobicity in discussions with customers.

of all oxygen concentrators sold. Of the six largest companies in the market, three--all Porous customers--received the ALERT or information derived therefrom. Ultimately, information from the ALERT pervaded the entire oxygen-concentrator filter market. A second relevant market is that for "resellers" of filters. Because the filters in question are disposable, they must be replaced occasionally in the equipment to which the filters are attached; "resellers" sell such replacement filters. Like the "original equipment manufacturer" market, the "reseller" market is concentrated among a small number of large-volume vendors, many of whom are also original equipment manufacturers. Of the six largest such venders, at least three received the ALERT or information from it. At trial, Porous demonstrated the ALERT's tendency to mislead its customers, who generally lack sophistication in the science of filtration mechanics and who have no understanding of the Porous filter's supposed "serious hydrophobic deficiency" or the irrelevance of that "deficiency." For example, customers reading the ALERT might conclude that Porous's filter would fail during humid days, and Pall's own marketing data indicated as much.

The parties dispute the extent to which the ALERT and the communications that followed it injured Porous or benefitted Pall. Porous complained of lost sales to current and future customers in the oxygen-concentrator and reseller markets, and claimed that its corporate goodwill had been injured by Pall's disparaging communications. Pall, meanwhile, argued that Porous's sales had actually increased during the period in question.

The parties also dispute the facts underlying the ALERT'S creation. Porous portrayed the ALERT as Pall's ruthless disparagement of its smaller competitor, but Pall argued that the ALERT merely responded to various misrepresentations that Porous had made about the two filters. By Pall's account (which the jury rejected), two Porous salespeople falsely told customers that the DBF23 was "just as hydrophobic" as Pall's BB50T, while others claimed that Porous's filter had an "extremely hydrophobic media" and was "industry-approved." Still others at Porous

repeatedly failed to disclose the DBF23's deficiencies in "wet" applications unless asked by customers. Meanwhile, Porous had conducted its own tests to compare the two filters at issue. Based upon those tests, Porous issued a "StarScan Report," which claimed that Porous's filter had performed slightly better than Pall's. Pall complained that the Report had misstated the two filter's relative performance and, more importantly, had failed to disclose that all of Porous's tests were performed under "dry" conditions.

Porous and Pall both sought legal redress. When Porous initiated the instant case, it pursued numerous causes of action: false advertising via section 43(a) of the Lanham Act, libel per se, and product disparagement. Pall, meanwhile, filed counterclaims under section 43(a) of the Lanham Act (false advertising) as well as common law trade-dress infringement. The jury rejected all of Pall's counterclaims. Among other things, it found that Porous did not "make false or misleading statements about Pall's products and/or its own products that actually deceived or had the tendency to deceive a substantial segment of the market." As to Porous's Lanham Act claim, the jury found that Pall's ALERT had "actually deceived or had the tendency to deceive a substantial segment" of the relevant market, that Porous was injured "as a result of" Pall's false or misleading statements, but that Pall's actions were not "willful and done in bad faith." The jury awarded Porous $1.6 million on the Lanham Act claim. Finally, the jury awarded nothing to Porous for its product disparagement claim. It found that Pall had made false statements about Porous's products in the ALERT but found no "special damages" directly attributable to those statements. Both before and after trial, the district court refused to permit Porous to amend its complaint to add a claim for punitive damages. It also declined to enjoin Pall's conduct or to award Porous attorneys' fees and costs under the Minnesota Deceptive Trade Practices Act.

The district court deferred trial of Porous's libel claim until after the jury's resolution of the other issues. Only during the libel portion of the bifurcated trial did

the court permit Porous to introduce (limited) evidence of the parties' earlier lawsuit: Porous Media Corp. v. Pall Corp., 110 F.3d 1329 (8th Cir. 1997). Like the present case, Porous I concerned a Lanham Act claim predicated upon Pall's misrepresentations about Porous's products.[5] We ultimately affirmed the jury's award to Porous of $5.5 million for common law product disparagement and $1.5 million under the Lanham Act. Porous I, 110 F.3d at 1332. The district court limited Porous I's admissibility to the issue of whether Pall had acted with malice, that is, with "knowledge of the falsity of the statement[s] [in the ALERT] or with substantial doubts about the truth of the statement[s]." After the bifurcated trial, two libel theories were submitted to the jury by special interrogatory: one submission asked whether Pall had acted with malice, while the other asked whether Pall had acted "with ill will and improper motives or without cause and wantonly for the purpose of injuring Porous Media." The jury answered the first question negatively, answered the second question affirmatively, and awarded Porous an additional $120,000. Following the parties' post-trial motions, the court held Porous to be a "limited purpose public figure" for the purposes of the First Amendment and Minnesota libel law, observed that the jury found no actual malice by Pall, and set aside the $120,000 libel verdict.

Both parties appealed. Pall argues that the jury's $1.6 million Lanham Act verdict cannot stand, in light of Porous's status as a "limited purpose public figure" and the district court's setting aside of the jury's libel verdict; that Pall's communications, including the ALERT, were neither "commercial speech" nor widely disseminated enough to fall within the Lanham Act; that Porous did not sufficiently prove its Lanham Act damages; and that the jury's rejection of Pall's false advertising counterclaim was "against the manifest weight of the evidence." Also

---

[5]Porous and Pall are particularly litigious business competitors. Setting to one side the present case and Porous I, the parties had three other suits pending before the district court as of that court's order of November 6, 1997.

discontented with the proceedings below, Porous maintains that the district court erred by finding Porous a "limited purpose public figure" and by setting aside the $120,000 libel verdict against Pall; that the court erroneously excluded Porous I and thereby hamstrung Porous's efforts to demonstrate Pall's "willful bad faith"; that Porous should have been allowed to amend its complaint to pursue a claim for punitive damages; and that Porous should have received attorneys' fees and expenses under the Minnesota Deceptive Trade Practices Act. We conclude that both parties' arguments are without merit, and we therefore affirm the district court's judgment in its entirety.

## II.

Because Pall's arguments on appeal depend upon the resolution of Porous's libel claim, we first address Porous's arguments before turning to Pall's.

## A.

Porous first asks that we reinstate the jury's $120,000 libel verdict against Pall. When the district court set aside that verdict by finding Porous to be a "limited purpose public figure," it relied primarily upon federal constitutional law (the First Amendment) rather than substantive Minnesota libel law. We disagree with the district court's First Amendment analysis--a matter we address later in Part III A. Nevertheless, we may affirm the district court's judgment on any basis supported by the record, see Zotos v. Lindbergh School Dist., 121 F.3d 356, 362 (8th Cir. 1997), and we conclude that Porous's libel claim fails as a matter of state law.

Porous's libel claim is foreclosed by our decision in Northwest Airlines, Inc. v. Astraea Aviation Services, Inc., 111 F.3d 1386 (8th Cir. 1997). There, we held that "Minnesota law considers a corporation a public figure and requires it to show that a statement was made with actual malice to establish a defamation claim." Id. at 1393

(citing Jadwin v. Minneapolis Star & Tribune Co., 367 N.W.2d 476, 487 (Minn. 1985)).  Because Porous is incorporated in Minnesota, conducts much of its business in Minnesota, is regulated by Minnesota (and to some extent, federal) authorities, and relies upon the substantive libel law of Minnesota, it is a "public figure" under state law and must demonstrate that Pall's statements were made with "actual malice." Porous failed to do so, for the jury found that Pall did not publish the ALERT and its accompanying report "with knowledge of the falsity of the statement or with substantial doubts about the truth of the statement."

Rather than attacking the jury's finding, Porous complains that our holding in Northwest Airlines misinterpreted Minnesota libel law.  Absent some intervening rejection of Northwest Airlines by Minnesota's courts or legislature, only the court en banc may overrule our previous holding. See Minnesota Citizens Concerned for Life v. Federal Election Comm'n, 113 F.3d 129, 131 (8th Cir. 1997) (only the court en banc may overrule a panel's decision).  Porous points to no intervening changes in Minnesota law that question or otherwise discredit Northwest Airlines. Accordingly, Porous's libel claim must fail.

**B.**

We also reject Porous's argument that the district court erred by excluding evidence of Porous I until the libel phase of the bifurcated trial.  Porous argues that Pall's disparagement of its products in Porous I bears a striking similarity to Pall's actions in this case; that the jury should have been informed about Pall's "ongoing trade war" against its smaller competitor; and that a retrial should be granted on the issue of Pall's "willful and bad faith conduct" under the Lanham Act and for purposes of punitive damages, which state law allows when a party has deliberately disregarded the rights of another.  Minn. Stat. § 549.20 (1996).  Specifically, Porous asserts that the district court's exclusion of Porous I prevented Porous from rebutting the testimony of Pall's spokesperson, who denied any ill will or malice toward

Porous. This same spokesperson (Steve Swalgen) authored the ALERT that warned of the Porous filter's "serious hydrophobic deficiency."

The district court noticed "some similarities and parallels" between Porous I and the present case but concluded that the previous lawsuit's "highly prejudicial" nature outweighed its probative value. See Fed. R. Evid. 403 (evidence may be excluded if danger of prejudice substantially outweighs probative value). The court based its conclusion upon its comparative assessment of the facts underlying both cases. First, the two cases concern different types of filters involved in fundamentally different industries; Porous I involved filters in the oil and gas and power plant industries, while the present case involves medical filters. Indeed, none of the individuals involved in the manufacture, sale, or testing of the filters at issue in Porous I were involved in the actions alleged by Porous in the present case, and the author of the ALERT (the same witness who testified to the absence of bad faith or ill will toward Porous) had no involvement whatsoever with Porous I. Second, the court observed a "temporal lack of connection" between the two cases. The events underlying Porous I occurred between 1986 and 1989, while the present case involves a letter published in 1993--seemingly belying Porous's description of Pall's "ongoing trade war."

We reverse a district court's exclusion of evidence only for an abuse of discretion. Cummings v. Malone, 995 F.2d 817, 823 (8th Cir. 1993). That discretion is broad where, as here, the district court must balance the evidence's probative value against the danger of unfair prejudice, confusion of the issues, or misleading the jury. United States v. Cody, 114 F.3d 772, 777 (8th Cir. 1997); Fed. R. Evid. 403. The balancing process required by Rule 403 is delicate, but it is within the unique competence of the trial judge "who saw and heard the evidence." Cody, 114 F.3d at 777. Even when relevant to show a party's motive or intent, prior bad acts or lawsuits often invite the jury to base its decision upon sheer hostility toward a party or upon the impermissible inference that the party acted in conformity with its prior misdeeds.

See Fireman's Fund Ins. Co. v. Thien, 63 F.3d 754, 758-59 (8th Cir. 1995); Fed. R. Evid. 404(b). In this case, the district court balanced the relevant concerns by admitting Porous I only for the limited purpose of demonstrating whether Pall had acted with "actual malice" when it maligned Porous's non-hydrophobic filter, that is, whether its statements were made with knowledge of their falsity or with substantial doubts as to their truth. See New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964). The district court allowed the jury to learn of Porous I only after it had resolved all issues in the case other than Porous's libel claim. Whether or not we agree with the particular balance reached below, we do not believe that the district court abused its substantial discretion.

## C.

We also detect no error in the district court's refusal to allow Porous to add a claim for punitive damages to its complaint. Minnesota law allows punitive damages when one party has deliberately disregarded the rights of another. Minn. Stat. § 549.20 (1996). A separate statute outlines the procedure for pursuing a punitive damages claim. See Minn. Stat. § 549.191 (1996). A party may not include such a claim in its initial complaint, but must instead move for leave to amend its complaint after establishing by "clear and convincing evidence" that the defendant's acts "show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20(1)(a); LeDoux v. Northwest Publishing, 521 N.W.2d 59, 69 (Minn. Ct. App. 1994). After trial (as well as before) the district court refused to allow Porous to amend its complaint. Specifically, the court held that Porous had not adduced sufficient evidence to create a prima facie case for punitive damages. Porous disputes this holding and directs us to the ALERT's warnings of the Porous filter's "serious hydrophobic deficiency" as well as Pall's own internal documents that acknowledge the non-relevance of hydrophobicity in oxygen-concentrator applications.

Under Minnesota law, a trial court's decision to grant or deny a motion to add

a claim for punitive damages is reviewed for an abuse of discretion. LeDoux, 521 N.W.2d at 69; Metag v. K-Mart Corp., 385 N.W.2d 864, 867 (Minn. Ct. App. 1986). We discern no such abuse of discretion in the district court's decision because we conclude that Porous's claim for punitive damages is inconsistent with the jury's verdict. First, the jury specifically found that Pall's actions were not "willful and done in bad faith." Second, it found that Pall had not acted with "actual malice," that is, with knowledge of the ALERT's falsity or substantial doubts as to its truth. Indeed, the jury reached this conclusion after learning of Pall's previous misdeeds in Porous I. Therefore, despite the jury's conclusion that Pall was liable under a less strict common law definition of malice, the district court did not err by finding a lack of "clear and convincing evidence" that Pall "deliberately disregarded" Porous's right not to have its DBF23 filter unjustly maligned.

## D.

In a similar vein, Porous argues that the district court should have awarded attorneys' fees and expenses under the Minnesota Deceptive Trade Practices Act, Minn. Stat. §§ 325D.44-.45 (1996). The Act permits--but does not require--an award of attorneys' fees and expenses if the defendant "willfully engaged in a trade practice knowing it to be deceptive." Minn. Stat. § 325D.45; Scott Fetzer Co. v. Williamson, 101 F.3d 549, 556 (8th Cir. 1996). A trial court's decision whether to grant fees under the Act is subject to reversal only for an abuse of discretion. Scott Fetzer Co., 101 F.3d at 556. Porous points to the jury's conclusion that Pall acted with common law malice, or "with ill will and improper motives or without cause and wantonly for the purpose of injuring Porous Media," and it requests that we remand the case to the district court for a determination of Porous's reasonable attorneys' fees and costs. We decline to do so.

Even assuming that Porous properly preserved this issue below--which the parties dispute--we do not believe that the district court abused its discretion by not

awarding fees and expenses. The court based its decision upon the jury's finding that Pall's conduct was not "willful and in bad faith." The Minnesota Deceptive Trade Practices Act merely permits the fee award that Porous seeks. Considering the jury's special verdict, we cannot conclude that the district court abused its discretion by electing not to award fees and expenses.

## III.

While Porous's claims on appeal mostly concern state law, Pall's center around the Lanham Act. Pall argues that its Lanham Act liability for false advertising must be tempered by the First Amendment, that the district court misapplied the Lanham Act to the facts of the case, and that the jury erroneously rejected Pall's Lanham Act counterclaim. We reject these arguments, just as we rejected those of Pall's adversary.[6]

## A.

Armed with the district court's holding that Porous is a "limited purpose public figure" under the First Amendment, Pall argues that its liability under section 43(a) of the Lanham Act must be limited in the same fashion as its liability under state libel law. Following the jury's finding that Pall had not acted with "actual malice," the district court set aside the jury's $120,000 libel verdict but permitted the $1.6 million Lanham Act verdict to stand. Both verdicts arose from the same set of facts--the ALERT and the communications accompanying and following it. Pall therefore asserts that Porous cannot evade the First Amendment's limitations on liability by

---

[6]We also deny Pall's motion to strike portions of Porous's cross-reply brief.

merely recasting its libel claim as a Lanham Act claim. See Hustler Magazine, Inc. v. Fallwell, 485 U.S. 46, 56 (1988) ("actual malice" standard of New York Times Co. v. Sullivan, 376 U.S. 254 (1964) applies even though public figure sues under tort of "intentional infliction of emotional distress" rather than tort of defamation).

Pall's argument fails because it depends upon the faulty premise that Porous is a "limited purpose public figure" under the First Amendment. While it is true that a defamation plaintiff cannot "avoid the protection afforded by the Constitution . . . merely by the use of creative pleading," Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, 39 F.3d 191, 196 (8th Cir. 1994), Pall's speech was not constitutionally protected in the first place. Minnesota law defeated Porous's libel claim because it regards Porous as a "public figure" and requires Porous to demonstrate "actual malice" by Pall. See Part II A, supra. But the contours of state libel law do not dispose of Porous's Lanham Act claim or Pall's First Amendment defense, which both present quintessentially federal questions. See Rosenblatt v. Baer, 383 U.S. 75, 84 (1966) (state law standards defining "public official" are not dispositive for First Amendment purposes).

Turning to the federal constitutional framework outlined in New York Times and its progeny, "limited purpose public figures" are those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Gertz v. Robert Welch, Inc., 418 U.S. 323, 345, 351 (1974); Lundell Mfg. Co. v. ABC, Inc., 98 F.3d 351, 362 (8th Cir. 1996). To determine whether Porous is a "limited purpose public figure," we must first identify the particular public controversy (if any) giving rise to the complained-of speech. Lundell, 98 F.3d at 363. We must then examine the "nature and extent" of Porous's participation in that controversy in order to determine whether Porous has "thrust [itself] to the forefront" of the controversy in an effort to influence its outcome. Id. (citing Gertz, 418 U.S. at 345).

Pall argues that the hydrophobicity of its competitor's filter is a matter of public concern. Because the use of non-hydrophobic filters in "wet" medical applications presents health hazards and because the FDA regulates the filters in such applications (such as the expiratory side of respiratory ventilators), Pall maintains, the issue of hydrophobicity takes on public importance. Furthermore, we are told, Porous thrust itself into the hydrophobicity debate by copying the design of Pall's filter, by informing individual customers that the DBF23 and the BB50T were equally hydrophobic, by developing and circulating the supposedly misleading "StarScan Report," and by selling the DBF23 without any warnings about its inadequacies in "wet" applications.

We are not persuaded. Whatever its importance to the parties before us, the DBF23's hydrophobicity is not a "public controversy." When Pall published its ALERT, Porous's glowing descriptions of the DBF23 had not meaningfully extended beyond the market for filters in "dry" medical applications--a market in which the filter's hydrophobicity was not relevant to Porous's customers or government regulators. When Pall warned Porous's customers of the DBF23's "serious hydrophobic deficiency," it created a controversy that did not otherwise exist.[7] It is well-settled that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." Hutchinson v. Proxmire, 443 U.S. 111, 135 (1979); Lundell, 98 F.3d at 363. We therefore reject Pall's First

_____

[7]Pall would have us base the "limited purpose public figure" analysis upon the "public controversy" surrounding the entire market for medical filters (i.e., including "wet" and "dry" applications) rather than the smaller "niche" market for Porous's product. Even if we were to accept the entire medical filter market as the proper analytical context for determining whether Porous is a "limited purpose public figure," and even if we were to assume that two filters' hydrophobicities amounted to a public controversy, we would hold that Porous's marketing efforts were insufficient to "thrust" Porous into the controversy. Our review of the record convinces us that Porous's representations about the two filters' hydrophobicities were at most isolated and generally implicit.

Amendment defense.

**B.**

We are equally unpersuaded by Pall's argument that its conduct did not fall within the Lanham Act's purview. Pall first argues that its ALERT was not "commercial speech"--a threshold requirement for Lanham Act liability. See 15 U.S.C. § 1125(a)(1)(B) (1994) ("commercial advertising or promotion"); 134 Cong. Rec. 31,851 (Oct. 19, 1988) (statement of Rep. Kastenmeier) (reach of section 43(a) "specifically extends only to false and misleading speech that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court"). Three factors govern whether speech is commercial: (i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-67 (1983). The presence of all three factors provides "strong support" for the conclusion that the speech in question is commercial. Id. at 67. Pall's ALERT meets all three conditions. It was an advertisement because it "proposed a commercial transaction." See Cincinnati v. Discovery Network, 507 U.S. 410, 423 (1993): "core" commercial speech "does no more than propose a commercial transaction."[8] The ALERT urged its readers to buy Pall's filter and not to buy Porous's. It did so by specific reference to both products.

_____

[8]Pall relies upon the narrow "core" definition of commercial speech and argues that the ALERT did not simply "propose a commercial transaction" but rather warned the public about the dangers of using Porous's filter in "wet" medical applications. Even if we were to accept Pall's description of the ALERT, the speech therein would remain "commercial speech" within the meaning of the Lanham Act. "Communications can constitute commercial speech notwithstanding the fact that they contain discussions of important public issues." Bd. of Trustees of the State University of New York v. Fox, 492 U.S. 469, 475 (1989); Bolger, 463 U.S. at 67. Of course, the ALERT discussed no "important public issues" in any event. See Part III A, supra.

Finally, Pall's internal communications and the jury's verdict demonstrate the financial concerns that motivated the ALERT's publication. Whatever nobler concerns may have driven Pall to inform the market of the public health dangers allegedly posed by Porous's non-hydrophobic filter, "commercial speech" need not originate <u>solely</u> from economic motives.

Pall next asserts that its communications were not widely enough disseminated to be actionable under the Lanham Act. This argument too is unavailing. To be "commercial advertising or promotion" under the Act, one's statements must be "disseminated sufficiently to the relevant purchasing public . . . within that industry." <u>Seven-Up Co. v. Coca-Cola Co.</u>, 86 F.3d 1379, 1384 (5th Cir. 1996). Pall sent its ALERT to only five recipients, but this fact alone does not defeat Porous's Lanham Act verdict. First, the required level of circulation and the relevant "purchasing public" "will vary according to the specifics of the industry." <u>Id.</u> at 1385. In this case, the "relevant purchasing public" is a small number of companies who dominate the oxygen concentrator original equipment manufacturing market and the filter "reselling" market. The jury found that the report deceived or had a tendency to deceive a "substantial segment" of the market for Porous's filter. In light of the concentrated structure of that market, the jury's finding is entirely plausible. Second, the ALERT itself is not the sole basis for Pall's liability.[9] Pall sent data and other information derived from the ALERT to other companies and repeatedly discussed the Porous filter's non-hydrophobicity with its customers. Information related to the ALERT was disseminated extensively in the market for Porous's filters. We conclude

_____

[9]Pall argues that its liability originates only from the ALERT itself and not from the related and wide-ranging communications that followed. We reject this argument. The jury found that Porous was injured "<u>as a result of</u> . . . the false or misleading statements" in the ALERT. Because Pall's broader post-ALERT communications were themselves causally connected to the ALERT, the jury could reasonably conclude that the injuries inflicted by the post-ALERT communications occurred "as a result of" the ALERT itself.

that such dissemination falls well within the Lanham Act's reach.

## C.

Pall next argues that Porous did not adequately prove its damages under the Lanham Act. The district court rejected this argument and thus denied Pall's post-trial motions for judgment as a matter of law and for a new trial. Pall appeals both denials.

We review de novo the denial of a motion for judgment as a matter of law, applying the same standard as the trial court. Kramer v. Logan County School District No. R-1, 157 F.3d 620, 623 (8th Cir. 1998). Reversal is warranted only if no reasonable juror could have found for the non-moving party. Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir.) (en banc), cert. denied, ___ U.S. ___, 117 S. Ct. 2510 (1997). We must assume as true all facts that Porous's evidence tends to show, assume that all conflicts were resolved in Porous's favor, and give Porous the benefit of all reasonable inferences that might be drawn from the evidence. Kramer, 157 F.3d at 623-24.

Pall's argument begins with its interpretation of the jury's special verdict. The parties disagree as to whether the jury found that Porous lost any sales as a result of the ALERT and whether Pall's false and misleading statements were found to have been made "willfully."[10] Based on its interpretation of the special verdict and upon

---

[10]If Pall "willfully" misrepresented the merits of the two filters, then Porous would be entitled to, among other things, an award of Pall's profits or revenues that resulted from its misrepresentations. The district court so instructed the jury, and Pall did not object. See George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537-40 (2nd Cir.) (willful or intentional misconduct justifies award of profits under theories of unjust enrichment or deterrence), cert. denied, 506 U.S. 991 (1992); Burger King Corp. v. Mason, 855 F.2d 779, 781 (11th Cir. 1988).

its assessment of Porous's goodwill damages as "speculative," Pall argues that the $1.6 million verdict "must be set aside in its entirety."

We are not convinced. Although damages may not be awarded on the basis of speculation or conjecture, we believe that the record adequately supports the verdict. We so conclude because Porous produced sufficient evidence of loss to its goodwill, which the district court's jury instructions defined as follows:

> The goodwill of a company is an intangible business value which reflects the basic human tendency to do business with a merchant who offers products of the type and quality which the customer desires and expects. Service to the customer and a willingness to stand behind a warranty or other representations about the quality of the products which are sold by a merchant are all factors in the goodwill of that business.
>
> The goodwill attached to a particular product or business may be symbolized in whole or in part by the consuming public's acceptance and recognition of the business. The goodwill attached to a product is a part of the overall business value which is the goodwill of the company. It is possible, therefore, that the general goodwill of a corporation may be damaged by the loss of goodwill to a particular product. Whether this has occurred is a question of fact for you to determine.

Pall did not object to this broad definition of "goodwill," and we therefore reject the narrower definition (i.e., the value of a company above the book value of its net tangible assets) that Pall now urges upon us.[11] Under the district court's definition of goodwill, which includes Porous's "business reputation,"(Porous App. 464), there is sufficient evidence to justify the $1.6 million verdict. Through the testimony of its principals, Porous established (i) the importance of its particular "business

---

[11]Compare J. Thomas McCarthy, Trademarks and Unfair Competition (4th ed. 1998), § 2.18 ("Good will as buyer momentum") with § 2.19 ("Good will as the value of a business beyond its tangible assets").

reputation" in the filter market and the extent to which Porous relies upon that reputation; (ii) that the ALERT damaged Porous's reputation; and (iii) the particular types of reputational injuries suffered by Porous (in addition to lost sales, "[W]e've had to jump through hoops to work with [our customers] and overcome references to hydrophobicity and how it works in their application and supply additional information to these companies."). In addition, Pall's internal marketing documents themselves document a "continued loyalty" to Pall's product as a "result" of Pall's warnings about the Porous filter's alleged hydrophobic shortcomings. Finally, a Porous principal testified that the company had lost "between $5 million and $10 million" in going-concern value based not simply upon lost sales but rather Porous's lost opportunity to "create a <u>reputation</u> for being the industry leader" and its damaged efforts to "creat[e] a <u>reputation</u> to be able to move onto the next level" beyond the oxygen-concentrator market (emphasis supplied).[12]

Based on the foregoing, we conclude that the evidence was sufficient to justify the damages award in Porous's favor. Moreover, because Porous produced sufficient evidence of lost goodwill, we need not resolve the parties' disagreements about the jury's special verdict.

---

[12]Pall complains that the $5 million to $10 million figure was the product of "speculative testimony." Although we are not certain that this testimony alone would sustain the jury's verdict, we again decline to pronounce a "rule of law that the testimony of a company's principals is too speculative to establish a material fact." <u>Porous I</u>, 110 F.3d at 1340. Further, we are not convinced that the dollar figure was the product of abject speculation by Porous's principal. We believe that the record as a whole demonstrates the type of goodwill injury suffered by Porous, the extent of that injury, and the causal nexus between the ALERT and Porous's damaged goodwill. Reputational damages are often difficult to quantify. Nevertheless, Porous need not prove such damages with exacting precision, for "a misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the customer." <u>Id.</u> at 1335.

The district court's denial of a motion for new trial, meanwhile, is "virtually unassailable" when the verdict is claimed to be against the weight of the evidence. Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995). Under such circumstances, "we reverse for a clear abuse of discretion only where there is an 'absolute absence of evidence' to support the jury's verdict." Id. at 657; (quoting Gopher Oil Co. v. Union Oil Co. of California, 955 F.2d 519, 526 (8th Cir. 1992)); see also Green v. American Airlines, Inc., 804 F.2d 453, 455 (8th Cir. 1986) (observing tension between Seventh Amendment and appellate review of verdict claimed to be against the weight of the evidence, where district court denies motion for new trial, and pointing to lack of cases reversing such denials). To the extent that Pall appeals merely the amount of the Lanham Act verdict, our review is similarly circumscribed. We will reverse a damages award as excessive only if it is "shocking," "monstrous," or constitutes a "plain injustice." City National Bank of Fort Smith v. Unique Structures, Inc., 929 F.2d 1308, 1315 (8th Cir. 1991). The limited scope of our review compels us to reject Pall's claim. In light of the evidence discussed above, the record does not present an "absolute absence of evidence" to support the verdict, and thus no clear abuse of discretion.

**D.**

Finally, Pall argues that the jury wrongfully rejected its Lanham Act counterclaim against Porous. The jury found that Porous made no "false or misleading statements about Pall's products and/or its own products that actually deceived or had the tendency to deceive a substantial segment of the market." The district court thereafter denied Pall's motion for a new trial. On appeal, Pall directs our attention to (i) Porous's claims that the DBF23 filter had "consistently lower pressure drops," (ii) Porous's claim that it had developed an "extremely hydrophobic media" for use with "wet" medical applications and its representation that the DBF23 was appropriate for "breathing circuit" or ventilator applications, (iii) Porous's claim that its filter had been "industry approved," and (iv) the StarScan Report and its

allegedly "false and misleading" comparison of the two filters at issue.

In essence, Pall argues that the verdict is against the weight of the evidence. As we said above, our review is limited. When a party challenges the weight of the evidence presented below, the district court's denial of a motion for new trial is "virtually unassailable." Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995). We reverse only when there is a clear abuse of discretion and an "absolute absence of evidence" to support the jury's verdict. Id. at 656-67.

The evidence offered by Pall is insufficient to reverse the jury's rejection of its Lanham Act counterclaim. Each of Porous's alleged misrepresentations was either outside the Lanham Act's reach or was shown by the evidence to be truthful. Porous's claims of "consistently lower pressure drops" in letters to its customers, for example, nowhere mentioned Pall or its filters. The letters merely stated that Porous's filter demonstrated "consistently lower pressure drops." Such statements of general superiority are mere "puffery" and are not actionable under the Lanham Act. Lipton v. The Nature Co., 71 F.3d 464, 474 (2d Cir. 1995); Cook, Perkiss & Liehe, Inc. v. Northern Calif. Coll. Serv., 911 F.2d 242, 246 (9th Cir. 1990). Turning to Porous's statements about an "extremely hydrophobic media," Porous presented evidence that it had produced a filter different from the original DBF23 and that its other filter was suitable for expiratory applications (although as yet unapproved by the FDA). The jury could have reasonably concluded that Porous's remarks referred to the company's more hydrophobic filter rather than the DBF23. Meanwhile, because some of Porous's customers referred to oxygen concentrators as "breathing circuits," the jury could conclude that Porous's sporadic use of that term was not false or misleading. As for the three letters written by a Porous sales representative which referred to the DBF23 as "industry-approved," there was evidence that one of the larger industrial users of medical filters had indeed formally approved Porous's product. The salesperson in question testified that he believed that Porous's product was "industry-approved" at the time he wrote the letters, and we conclude that the

"industry-approved" label amounts to puffery at most. So too the StarScan Report, which stated that the two filters were of roughly equal quality. At most, the report merely failed to disclose that the Porous filter was not suitable for "wet" medical applications--a disclosure shown by the evidence to be irrelevant for the market that Porous sought. Indeed, this showing of hydrophobicity's irrelevance was the very heart of Porous's own successful Lanham Act claim against Pall. In sum, a reasonable jury could (and indeed did) reject Pall's Lanham Act counterclaim.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.